**ANONYMOUS FIREMAN, Plaintiff,**

**v.**

**The CITY OF WILLOUGHBY, William Ryan, William E. Crosier, Dr. Joseph Koelliker, International Association of Firefighters, Local 2291, Defendants.**

No. C88–1182.

United States District Court,
N.D. Ohio, E.D.

Dec. 13, 1991.

---

**62.**  *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99,  102, 2 L.Ed.2d 80 (1957).

Gordon G. Beggs, Cleveland, Ohio, for plaintiff.

B. Lawrence Allen, Director of Law, Willoughby, Ohio, Mary G. Balazs, Reid, Johnson & Berry, Joseph Diemert, Cleveland, Ohio, for defendants.

### MEMORANDUM OF OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

KRENZLER, District Judge.

This case, in general, involves the issue of mandatory testing for the AIDS virus ("HIV") by a governmental agency. In particular, this case requires this Court to decide whether the City of Willoughby, Ohio, can require mandatory testing of its firefighters and paramedics for the AIDS virus as part of its annual physical examination for fitness to serve.

### PLAINTIFF'S ALLEGATIONS

Plaintiff alleges, in substance, that he is a fireman and paramedic who has been an employee of the City of Willoughby for over ten years, and that he seeks to enforce his right to be free from unreasonable searches, seizures, unwarranted invasions of privacy by the City and to remedy violations of his substantive due process rights based on the Fourth, Ninth and Fourteenth Amendments to the United States Constitution.

Plaintiff alleges that on the morning of May 10, 1988, without prior notice, he and the rest of his squad were transported to Bio–Path Lab in Willoughby and ordered to submit to a human immunodeficiency virus ("HIV") blood test, that he objected to the test, but that he complied with the directive to take the test, and that his blood was drawn.

He alleges that the City has no medical or other justification for imposing mandatory routine HIV testing on all fire division personnel, including plaintiff. The City has no facts constituting probable cause or reasonable cause or suspicion of HIV positive status as to any divisional personnel, including plaintiff. The City has no procedures for obtaining warrants authorizing the HIV test nor does it plan to obtain

warrants. The City had not adopted a policy to deal with division employees who tested positive for HIV. The City's testing policy contains no provision for education or counseling, either before or after testing, and the City did not afford plaintiff such education or counseling upon testing him. The City has not adopted procedures adequate to insure the confidentiality of HIV test data.

The plaintiff prays for a declaratory judgment that the City's testing violates the Fourth, Ninth and Fourteenth Amendments to the United States Constitution and seeks a permanent injunction prohibiting the City from conducting such testing.

### MUNICIPAL DEFENDANTS' ANSWER

In response, all of the municipal defendants (including the City of Willoughby, the Mayor, the Fire Chief and the City Physician) filed a joint answer which, in effect, was a denial of the principal substantive allegations of the plaintiff's complaint.

In addition, the municipal defendants contend that the plaintiff's constitutional rights were waived because a collective bargaining agreement which provided for HIV testing was executed by and between the union which represented plaintiff, International Association of Firefighters, Local 2291 ("IAF" or "the Union"), and the City. Further, the municipal defendants contend that no warrant is required in order to proceed with HIV testing, that the City's rules and policies with respect to the HIV testing are reasonable, and that plaintiff has failed to exhaust the administrative remedies available to him under the collective bargaining agreement.

### ANSWER OF INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, LOCAL 2291

In substance, the defendant Union filed an answer in the form of a general denial, and also filed counter and cross claims which deal more with the attorney fee issue than with the substantive issues raised by the complaint and the answer of the municipal defendants.

AIDS

Much has been written and said about the subject of Acquired Immune Deficiency Syndrome, or AIDS. It has now reached epidemic proportions, both in the United States and throughout the world. At the present time, there is no known cure for AIDS. The only way to stop its spread is by education and prevention until some cure is found. Billions of dollars are now being spent to find a cure for AIDS but, so far, these efforts have not been successful.

Universal precautions developed by the Center for Disease Control ("CDC") which provide for the use of gloves, glasses, garments and other protective coverings are required and used in some instances as a preventive against the transmission of the HIV virus.

A question in regard to testing for AIDS is whether there should be testing and, if so, whether it should be voluntary or mandatory. There are those who argue that any AIDS testing, especially testing by governmental agencies of their employees, must be either voluntary or based on probable cause or reasonable suspicion, and that otherwise it violates the Fourth Amendment to the United States Constitution as an unreasonable search and seizure.

There are those who argue that testing for AIDS, especially by governmental agencies involving high-risk employees, should be mandatory and that because of the epidemic proportions of AIDS, any such testing cannot be considered as an unreasonable search and seizure but as reasonable, under all the facts and circumstances.

In this case, we are dealing with a governmental agency, to wit, the City of Willoughby, which requires mandatory AIDS testing of its firefighters and paramedics as part of an annual physical examination.

It is noted that there is a difference in regard to the constitutional challenge between governmental and private employers and employees.

The defendants are contending that mandatory testing is proper because AIDS is an epidemic and firefighters and paramedics are high-risk employees and are at risk to contract and/or transmit AIDS in their line of duty.

Hopefully, a cure will be found for AIDS in the immediate future, but until then, we have to deal with the issue of mandatory testing by a governmental agency in this case.

It is well established that AIDS is principally caused by infection through sexual intercourse (especially anal sex), use of unsterilized needles, through blood transfusions, in pregnancy from mother to fetus, from mother to child through breast feeding, or from contact with contaminated blood and other bodily fluids which have blood in them, like mucus or saliva. It may take a number of years from the contact which transmitted the AIDS virus before a person knows he or she has AIDS or the AIDS virus.

After listening to all of the testimony in the case and reviewing all of the exhibits, it becomes obvious and well established that AIDS has now reached epidemic proportions and many things must be done including, but not limited to, the following:

1. *Education.* The public must be educated in regard to AIDS.

2. *Prevention.* Prevention must be practiced by everyone. The effective use of universal precautions are one known way of preventing the spread of AIDS.

3. *Pre-Test Counseling.* There must be counseling before AIDS tests are given.

4. *Post-Test Counseling.* There must be intensive counseling of those persons who have contracted AIDS so they can deal with the subject and the disease throughout the remaining years of their lives.

5. *Public Tolerance.* The public must become more tolerant of those persons who have contracted AIDS.

6. *Research—Cure.* Massive amounts of both public and private funds and efforts must be invested to find a cure for AIDS.

7. *Health Care Insurance.* Health care insurance must continue to be provided for persons with AIDS. In other words, people with AIDS should not be denied

health care insurance because they have contracted AIDS.

8. *Job Security.* People with AIDS should not be discriminated against in the workplace.

9. *Privacy—Discrimination.* The privacy of persons with AIDS must be protected. The fact that a person has AIDS should not become public knowledge, and those persons with AIDS should not be discriminated against.

The Court assumes that this case is a first step in a long hard road. The Court is assuming that this case will go on to the United States Circuit Court of Appeals and, ultimately, to the United States Supreme Court.

PLAINTIFF'S POSITION

The plaintiff contends that the mandatory testing for AIDS is not a necessary part of an annual physical examination for fitness for duty. The plaintiff says HIV testing is not the same as other physical examinations because it is intrusive. The plaintiff contends that the taking of blood for AIDS testing violates the Fourth Amendment as an unreasonable search and seizure. It also violates a firefighter's right to privacy. The plaintiff is also critical of the City of Willoughby because there is no counseling provided for those with AIDS.

The plaintiff also contends that conducting the test for AIDS from the same blood taken for the annual physical examination still amounts to an unreasonable search and seizure. You cannot use the same blood for additional tests. The testing for AIDS must be measured by the same standards as any other intrusion.

DEFENDANTS' POSITION

The defendants contend that the blood is already drawn and, therefore, it is reasonable to use it for AIDS testing and such testing is not a search. There was a waiver by the Union of the plaintiff's rights, and there was a failure by the plaintiff to exhaust his administrative remedies. Also, firefighters have no expectations of privacy, and firefighters and paramedics are in a high-risk position which makes the HIV test a reasonable search, if it is considered

to be a search. The defendants contend that the City wants to protect the firefighters and the public, and that any lacerations or any flowing blood may transmit the HIV virus, and the virus may also be transmitted by mouth-to-mouth resuscitation. The defendants contend that this compelling government interest outweighs any private interest.

TESTS FOR AIDS

There are two tests for determining AIDS: First, the ELISA test is given, and if it is positive, the Western Blot test is given for confirmation.

EXPERT WITNESSES FOR PLAINTIFF

1. *Dr. Leonard Calabrese.* He is head of the Immunology Section of the AIDS Activity Committee at The Cleveland Clinic. He testified that since 1981 he has treated more than 500 AIDS patients; that health care workers are no more susceptible of contracting AIDS than the general public; that he does not consider saliva, mucus or feces to be a transmitter unless there is blood involved; that firefighters and paramedics generally are not at high risk to get infected on the job; that the high risks are homosexuals and drug addicts who use needles and syringes; that firefighters and paramedics are not at as high a risk as compared to doctors and nurses; that exposures such as puncture wounds make a high risk; that the occupational risk for firefighters is low.

He testified that the universal precautions for health care workers protects both the public and the health care workers, and he does not recommend mandatory AIDS testing as a means of control; that doctors who have AIDS should not operate or perform surgery; He testified that one dentist transmitted AIDS he acquired off the job to three patients. This dentist subsequently died. He agreed that the universal precautions are not always used.

He testified that the use of gloves, goggles, or protective clothing depends on what you are examining and what you intend to do; that whenever you come into contact with blood, you need a protective covering, including goggles and gloves. He did agree that firefighters who are HIV

positive are dangerous because they can transmit diseases. A HIV positive test only indicates that a person was exposed to the virus.

Unfortunately, if people know other people have AIDS, the AIDS patients are shunned by their family and friends; they lose their jobs and cannot get insurance. Intensive counseling is needed because it is an infectious disease with no cure. People do not want to know if they are infected with the AIDS virus and when they do know, the psychological response runs from guilt to anger to fear to paranoia, etc.

2. *Dr. Michael Lederman.* He testified that AIDS is an infectious disease which spreads through sexual contact, contaminated blood by transfusions or bad needles; that a mother who has AIDS may transmit AIDS to a newborn child by breastfeeding; that health care workers are at low risk of becoming infected with AIDS or transmitting AIDS; that getting stuck with a needle when drawing blood is a one in 250 chance, based on statistics; that blood splashing was not a serious threat and that there was no risk of casual transmission of AIDS. This is based on family studies of people living at home, sharing the same beds and eating together.

He did testify that contaminated blood is a means of transmission of the AIDS virus, and that gloves, gowns, protective eyewear, etc, should be worn in dealing with blood and blood-contaminated fluids. He estimated that there are 1.5 million persons in the United States with AIDS.

He testified that counseling is very important, both before and after the AIDS test, and that if a test result is positive, it affects people's lives in regard to insurance, employment, etc. If people test positive for the AIDS virus, they get anxious and even suicidal. Because of the problems with positive findings, he recommends only voluntary testing because persons with HIV infections are ostracized from society.

EXPERT WITNESSES FOR DEFENDANTS

1. *Dr. Brian McNamee.* He testified that AIDS is now an epidemic with 150,000 reported cases in America. There is an incubation period of five to ten years for the symptoms of AIDS to appear. It is a long incubation period. The incidence of AIDS is increasing.

AIDS is spread by sex of all types, including homosexual and heterosexual intercourse, oral sex, anal sex, etc., as well as by blood and breast-feeding. We are early in the epidemic and there is a lag in the reporting period. Further, it takes a long time for AIDS to show itself. HIV is identified in every bodily fluid including blood, saliva and tears. Firefighters and paramedics are at high risk because of the nature of their work. Firefighters and paramedics are at higher risk than persons in hospitals because it is a non-controlled setting, as compared to an emergency room which is more controlled.

The universal precautions for firefighters, such as a space suit, boots, masks, gloves, etc., are not very practical because it is difficult to function wearing all of these garments; it is too much paraphenalia to work efficiently.

He also described the two AIDS tests, ELISA and the Western Blot, and he said that they are used in complementary fashion. These are very accurate tests. He said people should be educated first and then counseled later if they are HIV positive.

He justifies mandatory AIDS testing because firefighters and paramedics are at a high risk to get AIDS and are at a high risk to transmit AIDS.

2. *Dr. Stanley Fox.* He testified that AIDS is transmitted both dermatologically and sexually, and that he wants all cases of AIDS reported; that the universal precautions are not used and do not mean a thing in practice; that counseling should not be done before the blood test; that there should be early testing and early treatment in order to extend life; that baseline testing is a way to make early identification and that a baseline is needed to show the beginning of the disease and the early conditions; that if you notify a patient early, it is important and extends life; that with

sexual contact a partner should be notified; that education does not work because it has not worked to prevent pregnancies; that health care workers are high risks and that AIDS should be treated the same as any other ordinary disease.

He testified that doctors are scared because they are at high risk to contract AIDS. He said that the HIV test reports are sent from the laboratory to the doctor and are sealed and kept confidential.

## FINDINGS OF FACT

1. This is a civil rights action in which plaintiff challenges the routine mandatory screening of firefighters and paramedics for the human immunodeficiency virus ("HIV"). Plaintiff brings claims under the Fourth, Ninth and Fourteenth Amendments to the United States Constitution.

### *Parties and Witnesses*

2. Plaintiff in this case has been employed by the defendant City of Willoughby as a firefighter and paramedic for approximately 10 years and is a resident of Lake County, Ohio.

3. Defendant the City of Willoughby is a charter municipality organized pursuant to the home rule provision of the Ohio Constitution, Article XVIII, Section 7.

4. Defendant William Ryan is the Mayor and the Safety Director of the City of Willoughby.

5. Kenneth Stafford, Sr., was the Fire Chief of the City of Willoughby from 1971 to December 31, 1989, and was named as a defendant in plaintiff's complaint. William E. Crosier is the current Chief of Police and Fire and is substituted for Kenneth Stafford, Sr., as defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. Prior to this position, Crosier was the Chief of Police and was associated with the Police Department for over 20 years.

6. Defendant Joseph Koelliker has been the Willoughby City Physician since 1959 or 1960 and is a medical doctor who routinely advises the City on medical matters and conducts annual physical examinations for firefighters. Dr. Koelliker issued orders for HIV tests for firefighters.

7. Gary Johnson is a labor attorney who was the City's chief labor negotiator in 1988.

8. Defendant IAF has been at all relevant times the collective bargaining representative for the firefighters and paramedics in the City of Willoughby.

9. David Byrne is the President of the Cuyahoga County Firefighters and has represented defendant IAF in collective bargaining with the City of Willoughby from at least 1988 to the present as the Union's chief negotiator.

10. Melvin House was the President of defendant IAF and a member of the Union negotiating team in 1988.

11. Dr. Brian McNamee, Dr. Stanley Fox, and Dr. Michael Lederman are Medical Doctors, and Dr. Leonard Calabrese is a Doctor of Osteopathy, all of whom were admitted by the parties and the Court to be medical experts in the field of Acquired Immune Deficiency Syndrome ("AIDS").

### *City's HIV Testing Policy, History of the Policy, and Testing of Plaintiff*

12. The City policy in question requires routine mandatory HIV testing of all full-time firefighters and paramedics in the Willoughby Fire Department as part of their annual physical examinations. The purpose of these examinations is to certify fitness for duty.

13. The HIV testing policy is applicable to all new employees in the Willoughby safety forces, and to those presently employed in the safety forces, including firefighters and paramedics.

14. The required annual physical examination to determine fitness for duty has been a City policy since at least the early 1960's.

15. The physical examination routinely given to the City's firefighters and paramedics includes a variety of laboratory tests, including a number of tests on blood extracted from each person subject to the examination.

16. Blood tests given in conjunction with annual physical examinations provide a wide range of information about a person's general health.

17. The HIV test involves an additional examination of blood already drawn in conjunction with the annual physical examination, without additional blood being drawn.

18. The City uses an ELISA screening test for the HIV virus confirmed by a Western Blot test.

19. All experts agree that the ELISA test, performed in conjunction with the Western Blot test, are the most appropriate tests to determine if an individual is HIV positive. The accuracy of these tests approaches 99 percent.

20. Dr. Koelliker gave negative test results to firefighters over the telephone.

21. No accidental disclosure of laboratory reports has ever occurred for Willoughby employees or Bio–Path Laboratories.

22. Prior to the adoption of the HIV testing policy, Dr. Koelliker recommended voluntary HIV testing to City officials.

23. Dr. Koelliker communicated frequently with City officials regarding the subject of HIV testing, but never recommended mandatory testing.

24. Dr. Koelliker recommended that counseling and education be provided in connection with the HIV testing. Such counseling should occur prior to the testing.

25. Dr. Koelliker recommended that HIV test results be kept confidential because of the sensitivity of the test.

26. In January 1988, the Mayor of the City of Willoughby first announced the City's decision to add the HIV test to its examination of blood already drawn during the annual physical examination.

27. The policy as originally issued by Mayor Ryan on January 20, 1988, provided for voluntary testing.

28. On January 22, 1988, as part of the annual physical examination, the City offered Fire Department personnel voluntary HIV testing for the initial purpose of baseline testing.

29. Baseline testing is necessary to determine when an employee may have been exposed to the HIV virus, and if that exposure was employment related.

30. After City officials were advised that 100 percent participation in the HIV testing might not be achieved, thereby defeating the baselining concept, the Mayor revised his memorandum to require the additional examination of blood being drawn for HIV on all current and existing safety personnel at the annual physical examination to obtain a baseline for each employee.

31. That same date, Mayor Ryan issued a memorandum mandating HIV testing during the annual physical examination.

32. The City gave fire division personnel their annual physical examination without testing for HIV in February and March of 1988.

33. Upon objection by the Union, the testing was postponed pending negotiations with the Union, which remained incomplete until December 1988.

34. Upon request of David Byrnes, who had been contacted by Mel House, the City agreed to suspend HIV testing as part of the employees' physical examinations until a policy was negotiated concerning the treatment of HIV positive employees.

35. In the collective bargaining negotiations, the City took the position that it had the management right to do HIV tests on firefighters and paramedics.

36. The Union agreed that the City had the right to conduct HIV testing on firefighters and paramedics at the annual physical examination.

37. During the course of the collective bargaining negotiations around April 8, 1988, an AIDS testing policy was drafted by Gary Johnson and signed by Gary Johnson, Mel House, and David Byrnes.

38. During the course of collective bargaining negotiations, on or about May 5, 1988, the Union agreed to an AIDS testing policy, and this agreement was signed by representatives of both the Union and the

City. The Union was advised that the City would implement the HIV test.

39. On May 10, 1988, plaintiff and other members of the Fire Department were transported to the Bio–Path Lab for HIV blood screening as part of their annual physical examination. The plaintiff objected and the Lab personnel refused to perform the test. Other members of the Fire Department were given the blood test at this time. Later that same morning, plaintiff returned to the Lab and had his blood drawn.

40. The City of Willoughby had no suspicion that any firefighter was HIV positive on May 10, 1988.

41. The day the testing occurred Dr. Koelliker received a call from Sharon Bashis at Bio–Path Lab indicating that plaintiff did not want to have his blood drawn, and Dr. Koelliker instructed the Lab not to draw the blood for the HIV test.

42. The City provided no education or counseling to plaintiff at the time of his HIV testing.

43. Subsequent to May 10, 1988, the AIDS testing policy was amended by the City and the Union to the language appearing in the 1988 and 1990 collective bargaining agreements.

### Collective Bargaining Agreements Between City and IAF

44. The Union and the City of Willoughby have been parties to successive collective bargaining agreements. A collective bargaining agreement between the City of Willoughby and the Union was entered into and effective from April 1, 1986, until its expiration on March 31, 1988. Said agreement did not provide for HIV testing.

45. The most recent collective bargaining agreement is effective from April 1, 1990, through March 31, 1992, and the prior collective bargaining agreement was effective from April 1, 1988, through March 31, 1990.

46. Article VII of the 1988 and 1990 collective bargaining agreements embody the City's and the Union's agreement to the City's conducting of HIV testing as part of the employees' physical examinations, and address many of the plaintiff's concerns about mandatory testing, including counseling, confidentiality and job security.

47. The collective bargaining agreement, paragraph 12.03, indicates that a positive result on an ELISA screening test (the first test) will be shared with a firefighter before confirmation by the Western Blot (the second test).

48. Paragraph 12.03 of the 1988 and 1990 collective bargaining agreements provides that the physician performing the HIV tests must counsel each employee as to the testing process, the possibility of inaccurate test results, and any other medically appropriate subjects.

49. Paragraph 12.03 further provides that the results of the HIV test are to be kept confidential.

50. HIV-infected individuals showing no symptoms of related disease and without significant immune system dysfunction remain eligible for all employment benefits. No employee will be separated, and benefits will not be affected by a finding of HIV infection.

51. Under paragraphs 12.06–08 of the 1988 and 1990 collective bargaining agreements, if an employee tests positive for the AIDS antibodies, but is not afflicted with the actual disease AIDS, the City may either (a) make no changes in the employee's duties, (b) transfer the employee to another position in the Fire Department where the employee will not be in contact with the general public, (c) transfer the employee to another position outside the Fire Department, but the employee's wages will not be reduced and he will be kept in the Firemen's Pension System until his pension benefits vest, or (d) remove the employee from all duties, but continue to pay him his existing wages until his retirement, worker's compensation or pension benefits are approved.

52. Under paragraphs 12.04–05 of the 1988 and 1990 collective bargaining agreements, if an employee is actually afflicted with AIDS, the City may either (a) allow the employee to continue to work until he

is physically unable to do so, or (b) relieve the employee from duty, place him on injury leave for up to 90 days, then if necessary, put him on sick leave, pending approval of his retirement from the Firemen's Pension System. If the employee's sick leave is exhausted before his retirement is approved, the City will give the employee enough additional sick leave to keep him at full pay until his retirement is approved.

53. Under paragraph 26.01 of the 1988 and 1990 collective bargaining agreements, the City continued to pay the full premium for the hospitalization and medical insurance protection that existed when the agreement was entered into. There is no special provision concerning insurance coverage for employees with AIDS.

54. In both 1988 and 1990, the contracts containing these provisions were ratified by the Union members and by the City Council.

### AIDS Generally

55. AIDS is an epidemic in the United States and in the world that causes illness, disability and death.

56. Approximately 1.5 to 2 million Americans may be infected by the HIV virus.

57. In Greater Cleveland, it is estimated by the Center for Disease Control ("CDC"), based on emergency room studies, that 3 of every 1,000 people are infected by the HIV virus.

58. An estimate of HIV positive persons in Lake County can be derived by multiplying reported AIDS cases (25 through November 1990) by 10 (the CDC national ratio of estimated HIV positives to AIDS cases). This yields 250 HIV positive persons.

59. The number of AIDS cases is underreported as accurate diagnoses do not appear on death certificates.

60. The HIV retro-virus is responsible for the AIDS epidemic.

61. HIV does not equate with AIDS. HIV is the virus. AIDS is the extreme clinical form of the disease.

### Transmission of AIDS

62. The HIV virus exists in varying proportions in all bodily fluids of an infected person.

63. A person who has tested positive for HIV may remain healthy for four to seven years but continues to be infectious to others through his or her bodily fluids.

64. Transmission of the HIV virus occurs when the bodily fluid of an uninfected individual is contaminated by the bodily fluid of an infected individual.

65. HIV positive individuals, including firefighters and paramedics, may be carriers of infections and expose the public, or may contract those infections from the public.

66. An HIV-infected individual may become more infectious as times progresses.

67. HIV is transmitted sexually, by the passage of blood through the skin as in an intravenous injection, and in pregnancy from a mother to a fetus.

68. The most efficient means of HIV transmission are through a contaminated blood transfusion, sex (especially anal sex), sharing of needles, and from mother to fetus.

69. The CDC estimates the risk of contracting AIDS from a needlestick injury is 1 in 200.

70. Reports have indicated that AIDS may be spread through saliva, splashes to the skin, oral sex, and the mucous membranes.

71. The limits of HIV transmissability have not yet been completely defined.

72. The CDC has recently issued a report wherein it concluded that a Florida dentist transmitted HIV to three of his patients, although it was previously believed HIV could not be transmitted in this manner.

73. Unlike influenza, tuberculosis, the common cold or other epidemics, HIV is *not* transmitted through the air by droplet infection.

74. HIV is not transmitted by day-to-day, on-the-job contacts with co-workers.

75. There have been extensive studies of the risk of transmission of HIV in the health care worker context.

76. The incidence of AIDS among health care workers is almost twice that among the general population for unknown reasons.

77. Hospitals do not require their staffs to submit to routine screening for HIV.

### Reducing Risk of AIDS Transmission

78. To address and minimize the risk of transmission of HIV in the health care setting, the CDC, in 1985, developed a strategy of universal blood and bodily fluid precautions.

79. These universal precautions are now part of the routine provision of health care in the United States, and have been implemented by the Willoughby Fire Department.

80. Universal precautions assume that *all* health care workers and *all* patients are seropositive.

81. They include gloves, masks, gowns, and protective eyewear to be used as the situation requires.

82. Some of the methods used to reduce risk includes observing the CDC's "universal precautions"; engineering controls (e.g., the use of puncture-resistant containers for the disposal of needles), and work practices (e.g., requiring employees to wash their hands after contacting blood and other potentially infectious materials).

### Firefighters as Risk Group

83. Firefighting is not a casual environment and firefighters who are EMTA's and/or paramedics are in a high-risk occupation and are a high-risk group for contracting and/or transmitting the HIV virus.

84. Firefighters and paramedics are in a high-risk group for the contracting and transmission of the HIV virus since their duties include a significant risk of being exposed to blood, bodily secretions and bodily fluids. This line of work exposes the employees to high risk of bodily injury, lacerations, exposure to bleeding victims, puncture wounds and the like.

85. Firefighters and paramedics are at a higher risk than persons in hospitals for contracting or transmitting the HIV virus, because they work in a non-controlled setting. The universal precautions for firefighters, such as gloves, masks and other protective clothing, may not be practical in this setting.

86. The City of Willoughby has a legal obligation and duty to protect the residents of the City from contracting the HIV virus from such high-risk employees.

87. All the medical experts agree that mandatory HIV testing is medically appropriate in certain situations, including testing for certain high-risk groups and pre-employment testing. The United States Armed Forces and the State Department test all new applicants for HIV.

88. The additional examination for HIV of blood already drawn is medically appropriate for firefighters and paramedics in the City of Willoughby to protect the public, the firefighters, and to conduct baseline testing.

### HIV Testing

89. HIV tests show the presence of antibodies to the virus, rather than the presence of the virus itself.

90. The appearance of the antibodies is termed seroconversion. Prior to seroconversion, HIV is present in the blood and the individual is capable of transmitting HIV, although he or she tests negative.

91. Most individuals seroconvert within six to twelve weeks after exposure to the HIV virus, but seroconversion often does not occur until up to six months after an occupational exposure.

92. In cases of sexual transmission of the HIV virus, seroconversion may take one to three years.

93. All experts agree that the ELISA test, performed in conjunction with the Western Blot test, are the most appropriate tests to determine if an individual is HIV positive. The accuracy of these tests approaches 99 percent.

94. Both the ELISA and Western Blot tests for AIDS are performed on one blood sample prior to any result being communicated to a physician.

95. Dr. Lederman, who has ordered over 1,000 HIV tests, testified it is important to counsel patients because HIV tests carry significant importance to a person. Because of the significance of HIV tests to individuals and the risk of false positives, persons who are being offered testing should be counseled regarding the results and consequences of the tests, both before and after the test results are known.

*AIDS Symptoms*

96. Persons with HIV are generally asymptomatic for at least 5–7 years, and many HIV positive persons have been asymptomatic for over 10 years.

97. Early symptoms of AIDS are feeling washed out, a flu-like condition, swollen glands, and loss of weight.

98. Dementia may appear before any evidence of infection.

99. HIV is always fatal.

100. Early diagnosis and treatment of AIDS patients allows doctors to more effectively treat AIDS patients. New drugs administered early in the course of the disease may extend the life of the patient.

*Patient and Societal Reaction to AIDS*

101. A report of a positive HIV test, whether a true or false positive, is a very foreboding kind of message and the reaction of patients to this news is devastation.

102. Such reactions include depression, anxiety, inability to function properly at work, and mental breakdown, sometimes requiring hospitalization. In addition to these consequences, HIV positive persons must also contend with the social stigma of being HIV positive. This involves being disowned by family and friends, and being discriminated against in employment, insurance and housing. Dr. Calabrese testified that these HIV test results are like no other piece of news that he has to give to patients.

103. Failure to maintain confidentiality of information relating to HIV status creates a likelihood of discrimination against an individual.

104. If not handled properly, a positive HIV test result can lead to disaster, including suicide.

105. Because of the foreboding message that accompanies a positive HIV test result, some people simply do not want to know if they are infected.

CONCLUSIONS OF LAW

*Jurisdiction*

1. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331:

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

2. Jurisdiction is also conferred by 28 U.S.C. § 1343(a)(3):

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

\* \* \* \* \* \*

To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

3. In this case, the defendants contend that this Court does not have jurisdiction because there is a collective bargaining agreement between the City of Willoughby and the Union which requires an employee to follow grievance and arbitration procedures before commencing litigation.

4. The AIDS testing policy agreed to on May 5, 1988, and the two subsequent AIDS testing provisions embodied in the collective bargaining agreements are valid and enforceable contracts.

5. At all times pertinent to this case, a legally enforceable collective bargaining agreement existed between the City of Willoughby and the IAF pursuant to Ohio Rev. Code Ann. Chapter 4117. The agreement

contained grievance and arbitration provisions which detailed administrative procedures available to plaintiff.

6. This Court finds that it does have jurisdiction because it would have been a vain act for the plaintiff to follow the grievance procedures of the collective bargaining agreement. Further, the plaintiff has raised United States constitutional issues which supersede the grievance and arbitration procedures of the collective bargaining agreement.

*Fourth Amendment Analysis Generally*

7. The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and persons or things to be seized.

U.S. Const., Amend. IV.

8. The Fourth Amendment applies to the states through the Fourteenth Amendment, and has also been applied to cover the conduct of government officials in various civil activities. *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987).

9. Public employers are subject to the constraints of the Fourth Amendment. *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); *O'Connor v. Ortega,* 480 U.S. 709, 717, 107 S.Ct. 1492, 1499 (1987).

10. The Fourth Amendment is implicated in a case only if the plaintiff can show that the conduct of the defendant has infringed on an expectation of privacy that society is prepared to consider reasonable.

11. The Fourth Amendment does not prohibit all searches, only those that are unreasonable. *Schmerber v. California,* 384 U.S. 757, 768, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966). The determination of the reasonableness of a search requires balancing the need to search against the invasion which the search entails. On one side of the balance is placed the individual's legitimate expectations of privacy; on the other, the government's need for effective methods to deal with legitimate governmental interests. *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989).

12. A determination of the standard of reasonableness for the search requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the government interest alleged to justify the intrusion. *O'Connor,* 480 U.S. at 719–20, 107 S.Ct. at 1498–99; *Skinner v. Railway Labor Executives Ass'n.,* 489 U.S. at 619, 109 S.Ct. at 1414 (1989); *Glover v. Eastern Nebraska Commentary Office of Retardation,* 686 F.Supp. 243 (D.Neb. 1988), *aff'd* 867 F.2d 461 (8th Cir.1989), *cert. denied,* 493 U.S. 932, 110 S.Ct. 321, 107 L.Ed.2d 311 (1989).

13. Under this standard, both the inception and the scope of the intrusion must be reasonable:

Determining the reasonableness of any search involves a twofold inquiry: first, one must consider whether the ... action was justified at its inception; second, one must determine whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place.

*O'Connor,* 480 U.S. at 726, 107 S.Ct. at 1502; *Van Raab,* 489 U.S. 656, 109 S.Ct. 1384.

■ 14. One of the touchstones of the Fourth Amendment is that a search must be supported by a warrant issued upon probable cause. However, when a Fourth Amendment intrusion serves a special governmental need, it is necessary to balance the individual's privacy expectations against the government's interest to determine whether it is impractical to require a warrant or to require some level of individualized suspicion in the particular context.

■ 15. Where privacy interests implicated by the search are minimal and the

governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search can be reasonable despite the absence of such suspicion.

16. A governmental employer need not show evidence of individualized suspicion in order to conduct drug or alcohol testing. *Skinner, supra,* and *Von Raab, supra.*

17. *Skinner* and *Von Raab* abandoned any requirement for particularized, individualized suspicion as a predicate for random drug testing in the special circumstances of those two cases. *Skinner,* 489 U.S. at 634, 109 S.Ct. at 1422; *Von Raab,* 489 S.Ct. at 665–66, 109 S.Ct. at 1390; *National Treasury Employees Union v. Watkins,* 722 F.Supp. 766, 770 (D.D.C.1989); *Brooks v. East Chambers Consolidated Independent School District,* 730 F.Supp. 759, 766 (S.D.Tex.1989).

18. *Skinner* and *Von Raab,* thus permit urine testing without reference to reasonable suspicion of individual employees only in narrowly tailored circumstances where there is substantial generalized suspicion implicating compelling government interests and where individual privacy concerns are considered minimal. *Id.*

19. *Skinner* and *Von Raab* offer guidance, but they do not dispose of this case; instead, the Court must assess all the circumstances surrounding the search and seizure and the nature of the search and seizure themselves in order to determine whether the City's routine mandatory HIV testing satisfies the Fourth Amendment standard of reasonableness. *Skinner,* 489 U.S. at 619, 109 S.Ct. at 1414.

*HIV Test is a Search*

■ 20. The constitutional protection against unreasonable searches by the government does not simply disappear because the government has the right to make reasonable intrusions by conducting physical examinations in its capacity as employer. The HIV test requires a separate chemical analysis to obtain new and distinct information from that previously obtained in the blood tests given as part of the annual physical examination. The HIV

test is a new search and is subject to a separate analysis under the Fourth Amendment. *O'Connor,* 480 U.S. at 719, 107 S.Ct. at 1498; *Arizona v. Hicks,* 480 U.S. 321, 325–26, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987); *Patchogue–Medford Teachers Congress v. Board of Education,* 70 N.Y.2d 57, 517 N.Y.S.2d 456, 510 N.E.2d 325 (1987).

■ 21. HIV testing on blood already drawn from public employees as part of an annual physical examination constitutes an intrusion and a search and seizure within the meaning of the Fourth Amendment. The issue is whether it is reasonable or unreasonable. *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); *see Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967).

*Individual Privacy Interests at Stake*

■ 22. A labor organization cannot waive an individual's constitutional rights in a collective bargaining agreement with a city. A constitutional right can only be waived by the person involved. In addition, if mandatory AIDS testing is otherwise an unreasonable search and seizure, it cannot be considered reasonable because a provision in a collective bargaining agreement provides for mandatory AIDS testing.

23. The "... intrusion occasioned by a blood test is not significant, since such tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma or pain." *Ibid. Skinner* thus confirmed "society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity." *Skinner,* 489 U.S. at 625, 109 S.Ct. at 1417.

24. The fire and police industries are among the most highly regulated of any industry with respect to the performance of their employees. *Penny v. Kennedy,* 915 F.2d 1065 (6th Cir.1990) (Wellford, J., concurring). "[T]he expectations of priva-

cy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part on the health and fitness of covered employees." *Skinner, supra.*

25. If a person tests positive for the AIDS virus, the effects of the disease may not be readily or immediately noticed, and that person may perform his or her job effectively and efficiently for a considerable period of time. Under these circumstances, there would be no apparent reason to treat that employee any differently than any other employee. Further, the reasons for privacy are important at this stage of the disease.

26. However, at later stages of the disease, when it becomes obvious to anyone observing the person with AIDS that that person is suffering for some illness, and there is a reasonable suspicion that that person is suffering from AIDS, the privacy issue becomes diminished.

■ 27. While obviously psychological concerns of a deep personal nature may arise when a person is informed of a HIV infection following a test, these concerns do not themselves raise constitutional privacy issues, especially as other serious diseases—notably cancer—that may be revealed by blood tests undoubtedly present similar concerns. *Local 1812, American Federation of Government Employees v. United States Department of State,* 662 F.Supp. 50 (D.D.C.1987).

*Governmental Interests at Stake*

28. Because plaintiff's Fourth Amendment interests are implicated by HIV testing, it is incumbent on the City to offer a justification based upon the public interest, *O'Connor,* 480 U.S. at 727–29, 107 S.Ct. at 1503–04, and the Court finds the City's evidence does support the City's mandatory HIV testing.

■ 29. Criminal standards applying the unreasonable search and seizure tests to the City of Willoughby are inappropriate, since firefighters have a diminished expectation of privacy due to their heavily regulated public employment. *Chicago Fire Fighters Union, Local 2 v. Chicago,* 717 F.Supp. 1314 (N.D.Ill.1989).

■ 30. Mandatory AIDS testing by a governmental agency for the sole purpose of obtaining a baseline to determine whether an employee contracted AIDS on the job and thereby determine the validity of any future worker's compensation claims, is not valid. Mandatory AIDS testing of employees can be valid only if the group of employees involved is at a high risk of contracting and/or transmitting AIDS to the public.

31. The City's justification for the testing offered here is the pursuit of a safe work environment for its employees and the public.

32. The City of Willoughby must exercise its lawful authority to protect the public pursuant to Ohio Constitution, Article XVIII, Section 3.

■ 33. The City of Willoughby has a duty to keep its employees free from the risk of a contagious disease and to provide a safe workforce. *Leckelt v. Bd. of Commissioners of Hospital, District No. 1,* 909 F.2d 820 (5th Cir.1990).

■ 34. Fitness for duty is a compelling governmental interest for safety forces, including firefighters and paramedics.

35. That the AIDS "epidemic" is a matter of great concern to the public and to the government is a matter of common knowledge. The devastating character of this disease is frightening to everyone. *Glover,* 686 F.Supp. at 250.

■ 36. The protection of the public from the contraction and transmission of AIDS by firefighters and paramedics is a compelling governmental interest. Stopping the spread of the deadly AIDS epidemic is a compelling governmental interest.

37. It is critical that in such circumstances governmental units, the public and, most importantly, the courts, do not overreact and permit unreasonable invasions into a carefully formulated and preserved

constitutional right as a response to this concern.

██ 38. Whenever a government agency wants to order mandatory testing of its employees, the burden is on that governmental agency to prove that mandatory testing is necessary and that other precautions against the transmission and contraction of AIDS will not be effective.

39. Mandatory testing, in and of itself, does not prevent the contraction and/or transmission of AIDS. This Court recognizes that universal precautions are the most accepted method of preventing the contraction and/or transmission of the HIV virus. There is a direct link or nexus between the information conveyed by mandatory HIV test results for high-risk public employees and the prevention of the contraction and/or transmission of the HIV virus and AIDS. For high-risk government employees, mandatory testing and universal and other precautions against transmission of the disease are integrally related.

The information provided by mandatory HIV testing of high-risk government employees serves a compelling government interest and a public purpose. Negative test results advise the person that he or she does not have the HIV virus. This will give them a sense of relief and peace of mind. These persons, like all other persons who do not have the HIV virus, can practice prevention through the use of universal precautions and other means. Those persons who test positive for the HIV virus or AIDS itself will receive that information. It is recognized that this may have a negative effect on them, but it is important for them to know that they have the HIV virus before the symptoms occur. If a positive result is known at an early enough stage, the infected person can take medication and other means to prolong their lives. The Court sincerely hopes that in the meantime a new drug or drugs will be invented or created that will cure AIDS.

Obviously, a positive HIV test result will not prevent AIDS in that person. However, for persons who have tested positive for the HIV virus or AIDS, extra precautions can be taken to avoid the spread of AIDS by these persons. These infected persons who are in high-risk work may take extra precautions in their work, knowing that they have the HIV virus or AIDS. The universal precautions and other precautions can be practiced in a more thorough and meaningful manner. Also, as an alternative, such persons who are in high-risk work where there is a probability that they will transmit AIDS may be assigned to other non-high-risk work where the chance of transmission is mitigated or eliminated. Persons in non-high-risk work can continue to work and should practice all of the known precautions in order to prevent the spread of AIDS.

As long as persons who test positive for the HIV virus can perform their work at whatever level and there is no danger of transmitting the HIV virus, there should be no problem. These persons should not be discriminated against or ostracized from society or in their employment. What is trying to be accomplished is preventing persons from contracting and/or transmitting the HIV virus or AIDS. If persons do test positive and have the HIV virus or AIDS, trying to prevent its spread is a compelling governmental interest.

40. The medical evidence demonstrates that the risk of HIV transmission in the performance of the duties of firefighter paramedic is high.

██ 41. On the evidence before the Court, the City's inclusion of the test for HIV infection in the annual physical examination of its firefighters and paramedics is rational and closely related to fitness for duty and is a compelling governmental interest. *Local 1812, American Federation of Government Employees v. United States Department of State*, 662 F.Supp. 50 (D.D.C.1987).

42. The current conventional methods of dealing with AIDS is by the use of universal precautions and voluntary testing. This does not mean that mandatory testing is not available for use in high risk jobs. If an employer wants to use mandatory testing, it must demonstrate that uni-

versal precautions and voluntary testing will not prevent the contracting and/or spread of AIDS by high-risk employees or professionals. The City has made such a demonstration here.

43. State and local authorities have compelling interests in ensuring that its firefighters and paramedics are performing their duties free of having AIDS. Reasonable and particularized suspicion is not necessary as a precondition to mandatory AIDS testing of firefighters and paramedics. *Penny v. Kennedy*, 915 F.2d 1065 (6th Cir.1990).

### Conclusions

44. After careful consideration, the Court finds that the City's mandatory HIV blood testing policy for firefighters and paramedics is justified at its inception and is not an unreasonable search and seizure in violation of the Fourth Amendment to the United States Constitution.

45. The City of Willoughby, pursuant to the Fourth Amendment of the Constitution, is not required to obtain a warrant to conduct mandatory HIV testing of firefighters and paramedics. *Skinner v. Railway Labor Executives Association*, 489 U.S. 602, 109 S.Ct. 1402 (1989); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384 (1989).

46. The City of Willoughby need not show any individualized suspicion to conduct HIV testing of firefighters and paramedics.

47. This case does not stand for the general proposition of mandatory testing of all employees for AIDS, whether they be public or private, or mandatory testing for AIDS of the general public. This is a very limited decision and only stands for the proposition that mandatory testing may be ordered for high-risk government employees such as firefighters and paramedics. A high-risk government employee is one who has a high risk of contracting AIDS or transmitting AIDS. This is not the first time that a court has upheld mandatory testing for AIDS. Mandatory testing for AIDS has been upheld for United States

military personnel and by the State Department for overseas personnel.

48. If mandatory testing is warranted by a governmental employer under all of the facts and circumstances, the Court urges, although it does not require, that the mandatory testing should be combined with a variety of other things that will help with the prevention and spread of the disease and also ease the burdens and effect of the disease on those persons contracting AIDS. These factors include, but are not limited to, the following: (1) prevention by use of universal precautions, (2) pre- and post-testing counseling, (3) education, (4) job security as long as the infected person can perform his or her job, (5) alternative jobs commensurate with the capacity to perform the job, (6) health insurance, (7) disability benefits, and (8) right of privacy, so long as possible.

49. The City's routine mandatory HIV testing does not violate plaintiff's right to privacy as protected by the Fourth, Ninth and Fourteenth Amendments to the United States Constitution.

50. The collective bargaining agreement, paragraph 12.03, indicates that a positive result on a screening test (the first test) would be shared with a firefighter before confirmation by the Western Blot (the second test). Such a testing procedure in which the results of a screen are shared with the subject prior to conducting a Western Blot Test is medically inappropriate as preliminary screen results should not be given to the subject. The subject should be told only after the Western Blot test is given and the results are known.

51. Because of the significance of HIV tests to individuals and the risk of false positives, the Court urges that persons who are being offered HIV testing should be counseled regarding results and consequences of the tests both before and after the test results are known.

52. Based upon the foregoing Findings and Conclusions, this Court determines that the City's mandatory HIV testing policy for firefighters and paramedics is not an unreasonable search and seizure in violation of the Fourth Amendment, and does

not violate plaintiff's right to privacy as protected by the Fourth, Ninth and Fourteenth Amendments to the United States Constitution. Accordingly, the Court will enter judgment in favor of the defendants on plaintiff's complaint.