Robert A. SYRING, Plaintiff-Appellant-Petitioner,

v.

Carol E. TUCKER, Defendant-Respondent.†

Supreme Court

*No. 91–0699. Submitted on briefs January 7, 1993.—Decided April 23, 1993.*

(Also reported in 498 N.W.2d 370.)

†Motion for reconsideration filed by Amicus Curiae denied June 2, 1993.

789

790

793

794

For the plaintiff-appellant-petitioner there were breifs by *Bruce F. Ehlke* and *Lawton & Cates*, Madison.

Amicus Curiae briefs were filed by *Marc E. Elovitz, Jennifer L. Pariser* and *Debevoise & Plimpton* and *Ruth E. Harlow* and *William B. Rubenstein*, all of New York, New York and *Stephen M. Byers* and *Gretchen E. Miller*, all of Milwaukee for American Civil Liberties Union Foundation, American Civil Liberties Union of Wisconsin Foundation and The AIDS Resource Center of Wisconsin, Inc.

LOUIS J. CECI, J. This case comes before the court on Robert A. Syring's (Syring) petition for review of a court of appeals order which summarily affirmed the judgment entered by the circuit court for Dane County, Susan Steingass, Circuit Judge. Syring asked the circuit court for an order compelling Carol E. Tucker (Tucker) to submit to a physical examination, including a blood test, in order to determine whether Tucker transmitted any communicable diseases to Syring when she bit him. The circuit court concluded that although it could order Tucker to submit to such a physical examination, if

Tucker refused to comply, it could not under sec. 804.12, Stats., treat the refusal as a contempt of court. The circuit court concluded that it thus lacked the statutory power to compel Tucker to submit to the requested physical examination. We conclude that the circuit court correctly determined it did not have the power under sec. 804.12, Stats., to force Tucker to undergo a physical exam. However, we hold that the circuit court did have the equitable authority to do so. We also hold that, under the circumstances this case presents, compelling Tucker to undergo a physical exam is appropriate and that such an examination is constitutional. Accordingly, we reverse and remand.

The facts are undisputed. Syring, a social worker, works for the Dane County Department of Social Services (the department). On April 21, 1987, Tucker, a client of the department, came to the department's offices for a hearing. She became disruptive and was asked to leave. When a security guard attempted to escort her from the building, she became violent.

From his office, Syring heard a "ruckus." He stepped into the hallway to investigate and saw Tucker hitting the security guard with a long stick "the size of a shovel handle." Syring said that he "walked up to Ms. Tucker . . . and indicated to her that I was a bit concerned with her flailing that stick around." That stopped Tucker for a moment, but she soon resumed hitting the security guard.

Syring then attempted to restrain Tucker. He approached Tucker from behind and grabbed her around the arms. While Syring had his arms around Tucker, she lowered her head and bit Syring on the left forearm. The bite broke Syring's skin and he bled. According to the circuit court, "Tucker apparently yelled at him, after the bite, that she had AIDS."

Syring sued Tucker, alleging assault and battery. Syring claimed Tucker might have transmitted an "infectious disease or diseases" to him. The relief Syring sought included damages for pain and suffering and punitive damages.

Tucker did not file an answer and has refused to participate throughout this action, although she did authorize an attorney to represent her before the circuit court solely for the purpose of fighting any motions to compel her to submit to a blood test.

Syring filed a motion for physical examination which requested an order directing Tucker to submit to a physical exam which would include appropriate blood tests. Syring claimed he was "concerned" that Tucker "may have transmitted a communicable disease" to him when she bit him and that obtaining blood test results would allow him to determine what type of medical care he should pursue.

The circuit court granted Syring's motion for partial summary judgment on the issue of liability, and, in a written decision, discussed whether it had the power to force Tucker to undergo a blood test in the event she refused to voluntarily comply with an order directing her to submit to one. The court first concluded that sec. 146.025, Stats., which deals with restrictions on the use of tests for HIV in certain circumstances, did not apply to this case. It then concluded that sec. 804.12, Stats., precluded it from compelling Tucker to submit to a physical exam if she refused to comply with an order directing her to submit to an exam because sec. 804.12 does not allow a court to issue a contempt order as a sanction for refusing to submit to an ordered physical exam. The court then stated:

I conclude that the discovery rules under which testing is sought permit me to order the test but specifically prohibit me, in this or any other case, from enforcing by contempt any such order. Mr. Syring's remedies are otherwise. He is entitled to an order compelling Ms. Tucker to undergo the test. But if she continues to decline to do so, she may forgoe [sic] her defenses and a money judgment may be entered, but she may not be compelled to submit. No one is to force her, and if she does not consent, a motion for sanctions can be brought.

I realize that the crisis in this country occasioned by the AIDS epidemic places courts and citizens in situations for which our legal structure seems ill-suited. Perhaps this is one such situation. But, be that as it may, our legislature has spoken in reasonably unequivocal terms about its cherishment of the right of individuals vis-a-vis AIDS testing and release of results. But even if it had not, and deciding this matter as I do based upon Ch. 804 of the statutes and not sec. 146.025, Stats., I conclude that the rules of law must be followed.

(Emphasis in original.) The court entered an order directing Tucker to "submit to a physical examination, which examination shall include appropriate blood tests and such other examination as may be medically necessary to determine the possible presence of communicable disease, including, but not limited to, the disease known as AIDS . . .."

Tucker refused to comply with the court's order, and Syring brought a motion to compel Tucker to submit to a physical exam. The motion was denied.

When Tucker (who was in Taycheedah Correctional Institution for an unrelated incident) did not appear at a hearing on damages, the court adjourned the hearing and

sent a note to Tucker, informing her she could ask to have a writ issued for her appearance.

Some time before the newly scheduled damages hearing, the court attempted to make a conference call among the parties, but Tucker refused to come out of her cell to participate in the conference.

At the damages hearing, Syring testified that he was concerned that Tucker might carry a communicable disease like HIV because "[s]he also indicated subsequent to this incident . . . she in fact was an AIDS carrier." Syring said that he was 37 and his wife was 34 and that their uncertainty over whether Tucker had transmitted HIV to him had played a role in their decision to put off having children.

Tucker did not appear at the hearing; however, an attorney represented her for the sole purpose of defending any motion to compel Tucker to submit to a blood test. According to this attorney, Tucker had informed him that she had received notice of the hearing, but she did not wish to appear and had "said all she was going to say on the matter . . .."

The court awarded Syring $20,000 for past and future mental distress, making it clear that it made its award under the presumption that Tucker had not infected Syring with HIV. The court remarked that this award only went toward Syring's uncertainty and that "in equity or justice," if "any court were to be shown that in fact that virus had been communicated to Mr. Syring, . . . [a] different set of damages . . . should be assessed."

The court awarded Syring $10,000 in punitive damages, noting that it was "satisfied on this uncontroverted record Ms. Tucker's actions were wanton, reckless and in total disregard of Mr. Syring's rights . . .." The court made this award also under the assumption that Tucker

had not transmitted HIV to Syring, saying if Tucker were HIV positive, "in equity and justice that [would be] a piece of newly discovered evidence that would require a new trial. . .." The circuit court entered judgment, and the court of appeals summarily affirmed.

This court granted Syring's petition for review. *Amici curiae* American Civil Liberties Union Foundation, American Civil Liberties Union of Wisconsin Foundation, and the AIDS Resource Center of Wisconsin, Inc. (ACLU) have filed briefs on Tucker's behalf.

■

Syring sought an order under sec. 804.10, Stats., for a physical exam: "When the mental or physical condition (including the blood group) of a party is in issue, the court . . . may order the party to submit to a physical or mental examination." The ACLU argues that Tucker's HIV status is not relevant and therefore not "in issue." Evidence is relevant if it has any tendency to make the existence of a fact of consequence more or less probable than it would be without the evidence. Section 904.01, Stats.

Tucker bit Syring. Her teeth broke his skin, and her saliva came into contact with his blood. The ACLU contends that Tucker's HIV status is not relevant because HIV cannot be transmitted via saliva: "[T]here has not been a single documented case of HIV transmission through saliva, and scientists agree that such a transmission is virtually impossible." The ACLU cites numerous medical journals and studies. Syring counters with citations to other medical journals and studies, arguing the evidence is not uncontroverted that HIV cannot be transmitted through saliva.

■

Scientists have found HIV in tears, blood, semen, urine, breast milk, and saliva. Royce Richard Bedward,

800

Note, *AIDS Testing of Rape Suspects: Have the Rights of the Accused Met Their Match?*, 1990 U. Ill. L. Rev. 347, 349 [hereinafter *AIDS Testing of Rape Suspects*]. HIV could theoretically be transmitted via saliva, *see Johnetta J. v. Municipal Court*, 267 Cal. Rptr. 666, 674 (Ct. App. 1990); *Anonymous Fireman v. City of Willoughby*, 779 F. Supp. 402, 411 (N.D. Ohio 1991) ("Reports have indicated that AIDS may be spread through saliva, splashes to the skin, oral sex, and the mucous membranes."), although apparently there has not been a documented case of transmission via saliva. It may be that the greater weight of current scientific opinion holds that HIV cannot be transmitted via saliva. *See generally United States v. Moore*, 846 F.2d 1163 (8th Cir. 1988). Nevertheless, scientific opinion does not appear unanimous. Additionally, "much is still unknown about AIDS . . .." James E. Deline, Note, *Compulsory AIDS Testing of Individuals Who Assault Public Safety Officers: Protecting the Police or the Fourth Amendment?*, 38 Wayne L. Rev. 461, 462 n. 8 (1991) (citing U.S. Dept. of Health and Human Services, *Surgeon General's Report on Acquired Immune Deficiency Syndrome 5* (1986)) [hereinafter *Compulsory AIDS Testing.*] *See also Anonymous Fireman*, 779 F. Supp. at 411 ("The limits of HIV transmissability [sic] have not yet been completely defined.") We cannot conclude that Tucker's HIV status has no relevance.

The ACLU argues there is another reason Tucker's HIV status is irrelevant. According to the ACLU, if Tucker had infected Syring with HIV, Syring would have tested positive for HIV antibodies within six months of the bite. Therefore, the argument goes, the only way for Syring to determine his HIV status is to be tested himself. Again, the ACLU cites numerous medical journals and studies.

Syring has not said whether he has been tested or not, although from the record it appears that Syring was tested soon after Tucker bit him. We can assume, if he was tested, that he tested negative. In any case, the ACLU's argument fails to persuade us.

HIV tests determine whether an individual's blood contains HIV antibodies. David Kennon Moody, Note, *AIDS and Rape: The Constitutional Dimensions of Mandatory Testing of Sex Offenders*, 76 Cornell L. Rev. 238, 240–41 (1990) [hereinafter *AIDS and Rape*]. Thus, the phrase "AIDS test" is a misnomer. *Compulsory AIDS Testing, supra,* at 463. (The acronym AIDS stands for acquired immune deficiency syndrome.) AIDS is the final and most severe manifestation of HIV (human immunodeficiency virus). *AIDS Testing of Rape Suspects, supra,* at 347 n. 1. The reactions of those infected with HIV range from having no symptoms to developing full-blown AIDS. *Id.* at 348–49.

Individuals exposed to HIV usually produce antibodies within six months. *AIDS and Rape, supra,* at 241. Yet, "[c]ertain individuals do not develop antibodies for a year or more, and inexplicably, some asymptomatic persons may not develop them at all." Paul H. McDonald, Note, *AIDS, Rape, and the Fourth Amendment: Schemes for Mandatory AIDS Testing of Sex Offenders*, 43 Vand. L. Rev. 1607, 1612 (1990) (footnote omitted) [hereinafter *AIDS, Rape, and the Fourth Amendment*]. The uncertainty created by the inexact nature of HIV testing is compounded by the realistic chance of false negatives. *Compulsory AIDS Testing, supra,* at 464; *AIDS and Rape, supra,* at 241; *AIDS, Rape, and the Fourth Amendment, supra,* at 1614; Daniel E. Post, Comment, *The Constitutionality of Parole Departments Disclosing the HIV Status of Parolees*, 1992 Wis. L. Rev.

1993, 1997 ("[I]t is possible for an infected person to test negative; the test may have failed to detect antibodies that were present or it may not have detected antibodies if the infected person's body had not yet produced them." (Footnote omitted.)). "A blood test is, therefore, no guarantee either that the person tested has or does not have AIDS or the HIV antibody." *Doe v. Roe*, 526 N.Y.S.2d 718, 721 (Sup. Ct. 1988). Therefore, even assuming Syring has tested negative for HIV, a blood test of Tucker would still yield relevant information. Knowing Tucker's HIV status may not conclusively answer all of Syring's questions. Yet, " 'it is universally recognized that evidence, to be relevant to an inquiry, need not conclusively prove the ultimate fact in issue, but only have "any tendency to make the existence of any fact that is of consequence to the determination . . . more probable or less probable than it would be without the evidence." ' " *Skinner v. Railway Labor Executives' Assn*, 489 U.S. 602, 631–32 (1989) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 345 (1985), and Fed. Rule Evid. 401).

Even though Tucker's HIV status is relevant, the circuit court correctly concluded that sec. 804.12, Stats., precluded it from treating Tucker's refusal to comply with its order as a contempt of court. If a party fails to obey an order under sec. 804.10, Stats., for a physical examination, sec. 804.12 gives a circuit court a wide range of sanctions to impose. However, sec. 804.12(2)(a)4 explicitly forbids treating the refusal to comply as a contempt. The relevant portion of sec. 804.12(2)(a)4 states that a court may make "an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination." The circuit court correctly interpreted

and applied the plain language of sec. 804.12(2)(a)4, but that should not have ended its inquiry.

The real issue in this case is whether the circuit court had the power in equity to compel Tucker to undergo the requested physical examination. The court appeared to equate its lack of statutory authority under the discovery statutes with a complete lack of authority. The circuit court erroneously exercised its discretion when it concluded that the discovery statutes precluded it from acting; that conclusion was based on an erroneous view of the law. Wisconsin courts do not rely on the legislature for their power to act. *In Matter of Guardianship of Eberhardy*, 102 Wis. 2d 539, 548–50, 307 N.W.2d 881 (1981). Even though the circuit court had no power under sec. 804.12, Stats., to compel Tucker to undergo the examination, it did have the power—in equity.

Circuit courts have the power to apply equitable remedies as necessary to meet the needs of the case. *Prince v. Bryant*, 87 Wis. 2d 662, 674, 275 N.W.2d 676 (1979). "Once a court of equity obtains jurisdiction over a matter, it will exercise its jurisdictions [sic] in an effort to do complete justice between the parties to the action." *State v. Excel Management Services*, 111 Wis. 2d 479, 491, 331 N.W.2d 312 (1983).

The circuit court stated: "This case focuses on a number of competing concerns in a way likely not contemplated by the legislature when it enacted either sec. 146.025, Stats., or the discovery statutes." The circuit court also remarked that the "crisis in this country occasioned by the AIDS epidemic places courts and citizens in situations for which our legal structure seems ill-suited." Yet, a " 'court of equity has the power of devis-

ing its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties.' [Footnote omitted.]" *White v. Ruditys*, 117 Wis. 2d 130, 141–42, 343 N.W.2d 421 (Ct. App. 1983) (quoting 1 J. Pomeroy, *A Treatise on Equity Jurisprudence*, sec. 109 (5th ed. 1941)). "Where a new condition exists, and legal remedies afforded are inadequate or none are afforded at all, the never-failing capacity of equity to adapt itself to all situations will be found equal to the case . . .." *Harrigan v. Gilchrist*, 121 Wis. 127, 235, 99 N.W. 909 (1904).

The ACLU argues that a circuit court does not have the equitable authority to compel a physical examination in this case "because it would directly conflict with the dictates of the Wisconsin legislature." As the United States Supreme Court stated in *Porter v. Warner Co.*, 328 U.S. 395 (1946):

> [T]he comprehensiveness of . . . equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. *'The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.'*

*Id.* at 398 (emphasis added) (quoting *Brown v. Swann*, 35 U.S. (10 Pet.) 497, 503 (1836)). *See also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982); *Excel Management Services*, 111 Wis. 2d at 490.

The ACLU argues essentially that because the legislature has precluded a court from forcing physical exams under sec. 804.12, Stats., and has also limited the use of

HIV tests in situations that differ from the one presented in this case, the legislature would not want a court to exercise its equitable jurisdiction in this case. We reject this argument, because we do not lightly assume the legislature intended to limit courts' historic equitable jurisdiction. *See generally Porter*, 328 U.S. at 398; *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944); *Schafer v. Shelby Farmers Mut. Ins. Co.*, 246 Wis. 592, 594, 18 N.W.2d 365, 19 N.W.2d 241 (1945) ("It should require pretty clear language in a statute to warrant a conclusion that the ordinary equitable remedies are to be excluded in a particular case. This statute contains no express provision to this effect and we do not think the policy of the statute requires that such an intention be inferred.").

Nothing in sec. 804.10 or sec. 804.12 implies a limit on a court's equitable jurisdiction. A court has discretion in deciding discovery motions. *See, e.g., Payles v. Kost*, 167 Wis. 2d 387, 393, 482 N.W.2d 130 (Ct. App. 1992). When called on to order a physical examination, a court "may" order the party to submit to the exam under sec. 804.10. Additionally, when faced with a failure to comply with an order to submit to a physical exam, a court has discretion as to what sanction it will or will not impose. The list of sanctions in sec. 804.12 is merely illustrative, not exhaustive. A court may impose the listed sanctions "among others." *See* sec. 804.12, Stats. Moreover, the legislature has directed that a court faced with a refusal to obey orders under sec. 804.10 may make such orders in regard to the failure as are "just." Section 804.12, Stats. Sections 804.10 and 804.12 give courts discretionary authority and contemplate a balancing of the equities. *Cf. Mullen v. Coolong*, 153 Wis. 2d 401, 407, 451 N.W.2d 412 (1990) (Section 806.07(1)(h), Stats., "gives

the trial court broad discretionary authority and invokes the pure equity power of the court.").

The ACLU also argues that the legislature, by limiting the circumstances under which people can be tested for HIV and protecting the confidentiality of such results, has clearly implied it would disapprove of a court's using its equitable jurisdiction to compel Tucker to submit to a physical exam. *See, e.g.,* sec. 103.15(2)-(3), Stats. (employer-required HIV tests generally prohibited); sec. 118.125(2m)(b), Stats. (pupil test results confidential). The statutes the ACLU refers to do not apply to this case and do not create an inescapable inference as to how the legislature would have a court proceed in this case. Nevertheless, these statutes express a policy in favor of confidentiality of HIV test results that we think important. We will address this concern later when discussing the constitutional question a compelled test presents.

Although the circuit court and all the parties agree that sec. 146.025, Stats., does not apply to this case, the ACLU focuses on this statute. We do not read sec. 146.025 to create an inference that compelling Tucker to submit to a physical exam which includes an HIV test would somehow conflict with the legislature's commands. Section 146.025, "Restrictions on use of a test for HIV," deals with informed consent for HIV testing and the disclosure of HIV test results. Under sec. 146.025(2)(a)7, emergency medical technicians, fire fighters, peace officers, and correctional officers that are "significantly exposed" can ask the district attorney to seek an order directing an individual to submit to HIV testing. A circuit court must then hold a hearing to determine whether there is probable cause of "significant exposure." Thus, the statute at least contemplates

807

there may be situations in which a court should order an individual to submit to an HIV test. The statute at one time included "[e]xposure to saliva as the result of a bite during the course of which skin is broken" within its definition of significant exposure. *See* sec. 146.025(1)(em)4, Stats. 1987–88. The legislature repealed that definition in 1991 Wis. Act 269. However, as we have said, sec. 146.025 addresses circumstances different than those present here, and we do not read the statute's definition of "significant exposure" in those circumstances as either expressly or implicitly limiting the court's equitable jurisdiction in this case.

The equities of this case weigh in favor of compelling Tucker to submit to a physical examination. Tucker intentionally bit Syring. Sometime afterward she announced that she carries HIV. It is not clear from the record when Tucker did this. The circuit court said that "Ms. Tucker apparently yelled at him, after the bite, that she had AIDS." Yet, Syring testified that "[s]he also indicated subsequent to this incident, when she was up at Taycheedah, she in fact was an AIDS carrier." He said he learned of this from a police report. The record contains a copy of a criminal complaint regarding an incident at Taycheedah Correctional Institution in which Tucker allegedly bit a sheriff. The complaint indicates that Tucker "stated to Lt. Carpenter that she had AIDS . . .." No matter when Tucker said she had AIDS, Tucker has intentionally put her HIV status in issue. We agree with the circuit court that Tucker has acted wantonly, recklessly, and with no regard for Syring's rights.

Syring, on the other hand, has suffered tremendous uncertainty and anxiety. Besides suffering emotional distress, Syring has not been able to plan what course, if any, of medical treatment he should pursue. Additionally, and most importantly, he has not been able to make

a fully informed decision with his wife as to whether they wish to take a chance on having children. Monetary damages, even assuming Syring could collect on his judgment, are an inadequate remedy.

The relief Syring requests will correct an injustice resulting from the broad language of sec. 804.12, Stats. "This is the nature of the equitable, a correction of law where it is defective owing to its universality." Douglas Laycock, *The Death of the Irreparable Injury Rule*, 103 Harv. L. Rev. 687, 754 n. 353 (1990) (citing Aristotle, *Nicomachean Ethics* 1137b (W. Ross trans., in 2 *The Complete Works of Aristotle* 1796 (J. Barnes ed. 1984)). "For equity is regarded as just; it is, in fact, the sort of justice which goes beyond the written law." *Id.*

The ACLU argues that even if Tucker's HIV status is relevant and the circuit court has the equitable authority to compel her to submit to such a test, such a test would violate the fourth amendment of the United States Constitution and art. I, sec. 11 of the Wisconsin Constitution. We have consistently conformed Wisconsin's search and seizure law to federal search and seizure law. *State v. Guzman*, 166 Wis. 2d 577, 586–87, 480 N.W.2d 446 (1992). Whether a search is constitutional is a question of law. *Id.* at 586.

A blood test is a search. *Skinner*, 489 U.S. at 616. The fourth amendment does not prohibit all searches, merely unreasonable searches. *Id.* at 619. "What is reasonable, of course, 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.' " *Id.* (citations omitted) (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)).

The ACLU contends that any compulsory blood test must be supported by probable cause that the search will yield relevant evidence and, further, that Syring must demonstrate that the need for the evidence outweighs Tucker's legitimate expectations of privacy. *See Winston v. Lee*, 470 U.S. 753, 760 (1985); *Schmerber v. California*, 384 U.S. 757, 767 (1966). Syring does not argue that this is an improper standard, and we will thus proceed to use it. We note, however, that in analogous situations, courts have analyzed similar blood tests under a lesser standard. *See, e.g., Skinner*, 489 U.S. at 624–33 (individual suspicion not required); *Leckelt v. Board of Com'rs of Hosp. Dist. No. 1*, 909 F.2d 820 (5th Cir. 1990) (balance of intrusion against invasion of expectations of privacy); *Glover v. Eastern Neb. Com. Office of Retardation*, 867 F.2d 461, 463 (8th Cir. 1989); *Johnetta J.*, 267 Cal. Rptr. at 679 ("*Skinner* has relegated blood testing to a realm of lesser protection under the Fourth Amendment."). *See also* 2 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment*, sec. 5.4 at 116 (2d ed. supp. 1993) [hereinafter *Search and Seizure*]. We have already concluded that Tucker's HIV status is relevant, and we further conclude that because Tucker has said she has "AIDS," there is probable cause to believe an HIV test of Tucker's blood would yield relevant evidence. We now turn to determine whether the need for the physical exam outweighs Tucker's legitimate expectations of privacy.

Syring has demonstrated a compelling need to discover Tucker's HIV status. As discussed before, a negative test will diminish the anxiety and uncertainty that Syring lives with daily. A positive test will enable Syring to pursue proper medical treatment which could prolong

his life. Knowledge of Tucker's HIV status, negative or positive, will help Syring and his wife to make a more fully informed decision about having children. In addition to Syring's particular need, "the state interest in the health of its citizens is compelling." *See Search and Seizure, supra* sec. 5.4 at 117 (footnote omitted).

On the other side of the balance from this compelling need is a minimal intrusion. *See Skinner*, 489 U.S. at 628; *Johnetta J.*, 267 Cal. Rptr. at 679. Such a blood test should be performed by medical personnel in a medical environment, according to accepted medical procedures. *See Schmerber*, 384 U.S. at 771. The intrusion occasioned by such a blood test is " 'commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain'." *Skinner*, 489 U.S. at 625 (quoting *Schmerber*, 384 U.S. at 771). It is possible that force will be required in order to obtain a blood sample. The ACLU points to the use of force as a factor that it claims makes the invasion of privacy a blood test would entail outweigh the need for the blood test. However, force may be constitutionally employed in obtaining a blood sample as long as the force is "objectively reasonable in light of the facts and circumstances . . .." *Graham v. Connor*, 490 U.S. 386, 397 (1989); *State v. Krause*, 168 Wis. 2d 578, 589, 484 N.W.2d 347 (Ct. App. 1992). We conclude that the compelling need for the search outweighs any intrusion into legitimate expectations of privacy the search might entail.

The ACLU asserts that disclosing the results of Tucker's HIV test may cause Tucker to face discrimination. *See, e.g., South Florida Blood Service v. Rasmus-*

*sen*, 467 So. 2d 798, 802 (Fla. Dist. Ct. App. 1985), *aff'd* 500 So. 2d 533 (1987) ("AIDS, or a suspicion of AIDS, can lead to discrimination . . .."); *Doe*, 526 N.Y.S.2d at 726 ("AIDS has all too frequently been the occasion for discrimination, stigmatization, and hysteria."). The potential for discrimination is undoubtedly one of the reasons behind the confidentiality requirements of sec. 146.025, Stats.

Any legitimate expectations of privacy that Tucker might have had as to her HIV or AIDS status were forfeited when she publicly announced she had AIDS. If she tests positive, the test would only substantiate what she has already admitted or claimed to others, i.e., that she "has AIDS"—the possible reasons for confidentiality no longer exist because of Tucker's statements. If she tests negative, certainly her "reputation" would not be harmed; if anything, it might be enhanced, and she might be less subject to defensive responses by those around her.

From Syring's standpoint, a negative test would not only relieve him and his wife of their justifiable fears and apprehensions but would also remove from their relatives, friends, and associates the natural apprehension they might feel in his presence. He should be able to announce what for him and his wife would be very good news: "The person who bit me is HIV negative."

If the result proves positive for HIV, revealing it should be up to Syring. If he seeks medical advice he must, of course, tell his health care provider. Additionally, whether he tells others that the person who bit him was HIV positive should be his choice.

We conclude that Tucker is to be required to undergo a physical examination. This exam is to include

appropriate blood testing to determine if she carries HIV or other communicable diseases.

*By the Court.*—Reversed and remanded with directions.

SHIRLEY S. ABRAHAMSON, J. (*concurring and dissenting*). I concur in the majority's conclusion that it is within the circuit court's equitable powers to order the defendant in an appropriate case to submit to an AIDS test. I dissent from the court's decision to order the test in this case because I believe that the case should be remanded to the circuit court for the exercise of its equitable and discretionary powers. It is inappropriate for this court to exercise the circuit court's powers.

In determining whether to order a defendant to submit to an AIDS test, the circuit court must determine whether the evidence obtained would be relevant. A determination of the relevancy of the test in this case is within the discretion of the circuit court, reviewable by this court under the erroneous exercise of discretion standard. In making this determination the circuit court should hear expert testimony of up-to-date medical knowledge about AIDS and should not rely simply on secondary legal sources as the majority does here. With the proper medical information, the circuit court may conclude that the evidence is not relevant in this case because the defendant's test will have little, if any, probative effect.

On the basis of the secondary legal sources about AIDS, the relevance of testing the defendant in this case may be questioned for two reasons. First, in the six years since the defendant bit the plaintiff, the plaintiff has apparently tested negative for the HIV virus. The great weight of scientific evidence indicates that a person infected with HIV will develop antibodies and test posi-

tive within six months of the infection.[1] Furthermore, the likelihood of transmission by biting is minimal.[2] Thus, the likelihood that the plaintiff was infected by the defendant is remote.[3]

Second, testing the defendant will add little, if anything to the results of the plaintiff's tests. If the defendant tests positive, it will be impossible to determine whether the defendant became infected since biting the plaintiff or was infected at the time of the biting. If the defendant was infected at the time of the bite, it is likely, because of the plaintiff's negative test result and the minimal likelihood of transmission by biting, that she failed to transmit the virus to the plaintiff. On the other hand, if the defendant tests negative, a negative test

[1] *See* Albert, et al., *AIDS Practice Manual*, 2-27 (3d ed. 1992); Green, *The Transmission of AIDS*, in *AIDS and the Law: A Guide for the Public* 28, 29 (H. Dalton et al. eds., 1987); Daniel E. Post, *The Constitutionality of Parole Departments Disclosing the HIV Status of Parolees*, 1993 Wis. L. Rev. 1993, 1997 n. 19, citing Theodore M. Hammett, *Inst. Just. Issues & Practices, AIDS in Correctional Facilities: Issues & Options* 4 (3d ed. 1988); *Doe v. Roe*, 526 N.Y.S.2d 718, 721 (Sup. 1988); David Kennon Moody, *AIDS and Rape: The Constitutional Dimensions of Mandatory Testing of Sex Offenders*, 76 Cornell L. Rev. 238, 241 (1990), citing Institute of Medicine, *Confronting AIDS: Update 1988* at 114.

[2] *AIDS and the Law* at 35; *AIDS Practice Manual* at 2-13; *Barlow v. Ground*, 943 F.2d 1132 (9th Cir. 1991); *Glover v. Eastern Neb. Com. Office of Retardation*, 867 F.2d 461 (8th Cir. 1989); *Johnetta J. v. Municipal Court*, 218 Cal. App. 3d 1255, 267 Cal. Reporter 666 (Ct. App. 1990).

[3] I acknowledge that some legal writing indicates that a person could become infected and fail to test positive within the six-month period. *See* Herman and Schurgin, *Legal Aspects of AIDS*, § 1.30 (1991).

result tells the plaintiff nothing more than the plaintiff's own negative test result.

In determining whether to order the test, the circuit court should also consider the stigma attached to HIV infection. Unjustified fears about transmission of AIDS have caused our society to discriminate against persons who have, or are suspected of having, AIDS. The legislature has recognized the seriousness of this problem. In light of the legislative policy evidenced in the statutes, a court should be reluctant to require testing or to divulge an individual's HIV status when such actions may subject that person to the unfortunate consequences of being labelled "an AIDS carrier." This caution to proceed with reluctance may not be warranted in this case, however. Since the defendant labelled herself as HIV infected by declaring that she "had AIDS," a court-ordered test can disclose no information about her HIV positive status that she has not volunteered.

Because these are matters for the circuit court, I would remand the case.

I am authorized to state that Chief Justice NATHAN S. HEFFERNAN joins this opinion.