OPINION OF THE COURT
Kristin Booth Glen, J.
This motion brought pursuant to CPLR 3121 raises an important question not previously addressed in any written or reported decision concerning the obligation of a parent seeking to retain custody of her/his child to submit to a compul *210 sory test for Acquired Immune Deficiency Syndrome (AIDS). In addition to the general questions which apply in determining CPLR 3121 motions, this application presents issues of privacy, public policy and Fourth Amendment rights. Further, the special characteristics of AIDS and AIDS testing, the potential stigmatization of persons identified as suffering from AIDS or infected with the so-called AIDS virus, and other detriments of nonconsensual mandatory testing for this dread disease suggest that a much stricter standard than materiality and relevancy should be employed where AIDS testing is at issue.
To place the issues in context, a brief summary of the facts may be useful.
FACTS
Respondent father is the present and long-term custodian of two minor children. Petitioners, the maternal grandparents, have obtained certain information, otherwise inadmissible, that respondent has told various persons that he is suffering from AIDS. When asked on the stand, in the course of the custody hearing, whether he had in fact made such statements or whether he suffered from AIDS, the respondent asserted his Fifth Amendment privilege. Based on this assertion of privilege, I drew a negative inference as permitted by law.
Thereafter, petitioners moved for an order compelling the respondent to submit to a physical examination, specifically "an examination to test for AIDS”. The motion did not indicate whether the "test” required was a general physical examination which might indicate that respondent was actually suffering from AIDS, or a blood test to determine whether he was seropositive for the HIV antibody. Respondent opposes any blood test, although he consents to undergoing a physical examination. The question is, therefore, what standard must be met, or what showing made before an involuntary AIDS test can be compelled. Before this question can be addressed, the present level of knowledge concerning AIDS and AIDS testing, as well as special problems such testing raises, relevant case law and clearly expressed public policy must all be reviewed and considered.
THE PRESENT MEDICAL UNDERSTANDING OF AIDS AND HIV-SEROPOSITIVITY.
AIDS is the clinical manifestation of a dysfunction of the *211 human immune system caused or at least widely thought to be caused by a recently discovered virus. (Logallo et al., Frequent Detection and Isolation of Cytopathic Retro Viruses [HTLV-II] from Patients with AIDS and at Risk for AIDS, 224 Sci 500 [May 1984].) The AIDS virus has received several names: Human T-Lymphotrophic Virus Type III (HTLV-III); Lymphadenopathy-Associated Virus (LAV); AIDS-Associated Retro Virus (ARV); and, most recently, Human Immuno Deficiency Virus (HIV). (Coffin et al., Human Immuno Deficiency Viruses [letter], 232 Sci 697 [May 1986] [proposing HIV terminology].)
Persons who are infected with the HIV virus fall into three categories. The first, or what is commonly referred to as AIDS, 'is the most severe form of the infection, and most victims of the disease die within two years. It is characterized by a breakdown of the immunological system and the presence of one or more opportunistic infections such as Kaposi’s sarcoma and Pneumocystis Carinii pneumonia. The second possible form of infection is AIDS-Related Complex (ARC), a milder degree of immuno deficiency characterized by a number of symptoms including swollen lymph nodes, persistent fever, fatigúemete. The third and most common form of infection is asymptomatic, which results in no abnormal infections. There is no certainty that persons in the third category will ever develop either ARC or AIDS itself, although it is predicted that some 25% to 50% of persons infected with the virus will develop AIDS within 5 to 10 years of the initial infection. (Institute of Med, Natl Academy of Sci, Confronting AIDS: Directions for Public Health, Health Care and Research, at 91 [1986].)
As of November 9, 1987, the total reported number of persons with AIDS (that is,. the most virulent form of the disease) in the United States reached 44,795, over half of whom have died. (Federal Center for Disease Control [CDC], Weekly Surveillance Report-United States AIDS Program, Nov. 9, 1987.) The group of persons who are infected with the HIV virus but who are suffering neither from AIDS nor from ARC, commonly referred to "seropositives” in the United States, is estimated to be between 1 and lVi million. (Public Health Service Plan for Prevention and Control of AIDS Virus: Report of Coolfont Conference, at 4 [June 4-6, 1986], reprinted in principal part in 101 Pub Health Rep 341 [July-Aug. 1986].) According to an estimate of Dr. James Curran at the Center for Disease Control, of men between the ages of 20 and 50, *212 approximately 1 in 30 carries the virus. (AIDS: Statistics But No,Answers, 236 Sci 1423, 1425 [June 12, 1987].)
MEDICAL ASPECTS OF AIDS TESTING
To speak of an examination for AIDS, therefore, is to propose a number of entirely distinct possibilities. First, an individual could be subject to a general physical examination which, if s/he were suffering from full-blown AIDS would likely reveal one of the characteristic opportunistic infections. Second, the symptoms of ARC might also be apparent in a general physical examination, although confirmation of the disease and the cause of the symptoms might be dependent on a blood test. The third, and the most commonly used notion of an "AIDS test”, is a blood test which simply shows whether the individual tested is seropositive for the HIV antibody.
Demonstration of the extraordinarily high level of false-negatives and positives from the original AIDS blood test has led to the standard use of a two-part process. The Enzyme-Linked Immunosorbent Assay (ELISA) test is the initial screening test.[1] The second step of the testing process is the confirmatory test; the primary confirmatory test now in use is the Western Blot Test.[2] Even this two-part testing protocol may, however, produce errors.
The test may register negative in the early stages of viral infection before the antibodies have been sufficiently mobilized to show up as positive on an antibody test. This incubation period — the time between infection and antibody reaction— usually lasts about six weeks but may be as long as six *213 months or more.[3] False-positives can also occur.[4]
[5]Finally, even these accuracy rates assume that the test is performed properly. The accuracy rates of commercial laboratories offering the test vary widely, including up to 20% false-positivity rates on pretested samples.®
A blood test is, therefore, no guarantee either that the person tested has or does not have AIDS or the HIV antibody. Besides these technical difficulties, however, nonvoluntary AIDS testing presents a number of problems which have been recognized by authorities involved in the field.
SPECIAL PROBLEMS OF AIDS TESTING
The lack of absolute reliability, threat to civil liberties, potential ostracization, and psychic harm which may occur from mandatory testing have resulted in most experts and organizations including the Surgeon General of the United States, the United States Public Health Service, the American Medical Association (AMA), and most State and local health departments, including New York’s, opposing mandatory non-voluntary testing.
A person who has been involuntarily tested for AIDS and receives a positive result may suffer a number of possible injuries. Perhaps first and foremost among these is the danger of stigmatization and ostracism which may result. The AMA Board of Trustees has written "the stigma which accompanies a diagnosis of AIDS, based on fear and society’s attitude towards IV drug abusers and homosexuals .presents a factor beyond the control of the infected individual or medicine. An HIV-Seropositive individual who might live five years or much longer with no overt health problems, once identified in a community, may be subject to many and varied discrimination, by family and loved ones, neighbors and friends, employers and fellow employees, and other providers of services.”' (AMA Board of Trustees Report, Prevention and Control of Acquired Immuno Deficiency Syndrome: An Interim Report, 258 J Am Med Assn 2097, 2098 [1987].) In addition, the psychological impact of learning that one is seropositive has been compared to receiving a death sentence. Sequelae include *214 severe stress and depression, including possible contemplation of suicide.[6] Besides these social and psychological dangers, mandatory AIDS testing also raises serious Fourth Amendment questions.
It is well established that an involuntary blood test constitutes a search and seizure within the Fourth Amendment’s scope requiring probable cause. (Schmerber v California, 384 US 757 [1966].) Where a bodily intrusion may additionally endanger the health of the person sought to be tested (including, of course, mental health), a compelling need must be shown. (See, Winston v Lee, 470 US 753 [1985].) The law on mandatory testing to detect the presence of drugs is in a process of evolution, but those tests have also been declared unconstitutional under the Fourth Amendment absent a reasonable suspicion of impairment on the job or a truly compelling State interest in regulating a particular industry. (See, e.g., Matter of Caruso v Ward, 131 AD2d 214 [1st Dept 1987].)
This amalgam of problems has resulted in opposition to involuntary AIDS testing by such groups as the ACLU (See, National ACLU Policy § 268, Communicable Diseases and AIDS, adopted July 16, 1986). The Association of State and Territorial flealth Officials (ASTHO) has also taken a position with regard to the availability of information concerning HIV testing in response to court subpoena. In the absence of legislation proposed by ASTHO the organization proposes "Public Health agencies should advocate that court orders for disclosure of name-linked information should not be issued except when compelling reasons for disclosure are demonstrated.” (ASTHO, Guide to Public Health Practice: AIDS Confidentiality and Anti-Discrimination Principles: Interim Report, at 7 [Nov. 1987]; emphasis added.)
While there is no consensus under what circumstances the extraordinary remedy or involuntary testing should take place, it is clear that the medical, psychosocial, and legal ramifications of such testing place it on an entirely different plane than other, noninvasive or minimally invasive procedures. This information must be taken into account whenever an involuntary AIDS test is sought, and must be part of the balancing process in which a court engages.
*215 CASE LAW ON TESTING
Surprisingly few' cases have been found in which an AIDS test, or, more accurately, HIV antibody test was sought in a court setting. In the first reported New York case, People ex rel. Glass v McGreevy (134 Misc 2d 1085 [Sup Ct, Rensselaer County 1987]), the court held that it was improper and an abuse of discretion to impose the condition of a negative AIDS test prior to release on bail.
In Matter of Department of Social Servs. v Janice T. (137 AD2d 527 [2d Dept 1988]) the Second Department reversed an order directing an AIDS test for a woman who bit a Deputy Sheriff while he was attempting to execute a warrant in a neglect proceeding. The court did not have to consider whether a stricter standard was required in the AIDS setting since it found, pursuant to Family Court Act §§ 251 and 1038-a, that the results of a blood test were not even "reasonably related to establishing the allegations” (supra, at 528) in the neglect .proceeding.
In one unreported Family Court abuse proceeding where the respondent mother was charged with biting her son and the son had threatened suicide because of his fear of contracting AIDS, the Judge withdrew his order after being apprised of the city’s position against involuntary testing by representatives of the Human Resources Administration and the City Commission on Human Rights. (Matter of Michael P. [CSS], docket No. N1456/86, Fam Ct, Richmond County 1986, order withdrawn Matter of Joann B., docket No. N1459-61/86, Fam Ct, Richmond County 1986, reported in Staten Is Advance, Feb. 3,1986, at Al, and Feb. 13, 1986, at Al, A6.)
There are also several unreported decisions from other States which have arisen in custody disputes. In one such case involving a request for an HIVS-antibody test, an Ohio court refused to order a gay father to submit to such testing as a condition for visitation despite a request by his ex-wife, the custodial parent. (Matter of Smalley, No. 83-112, Domestic Relations Ct, Muskingum County, filed Dec. 1986, reported in Lambda, 2 AIDS Update, No. 1, at 4 [June/July 1987]; accord, Doe v Doe, No. 78D 5040, Cir Ct, Cook County, 111 1978; J.R. v L.R., Cir Ct, St. Louis County, Mo 1986; In re Marriage of Grein, No. 80-C-72, Cir Ct, Champaign County, 111 1988 [mother, a nurse treating AIDS patients, required to inform court and father concerning her patients, but no test or-
*216 dered].)[7] However, none of these cases considered the public policy aspects involved in involuntary AIDS testing, particularly where the relevant public policy was clear and unambiguous.
NEW YORK PUBLIC POLICY ON AIDS TESTING
The clear position of State and city health officials has been a virtually complete ban on involuntary testing for the HIV virus. Laboratories which may conduct the tests are limited in number and subject to strict regulation. They are specifically prohibited from conducting any test in the absence of a signed consent form. (10 NYCRR 58-1.1, last amended Oct. 1, 1987 [State regulation]; ÑY City Dept ‘ of Health Commr’s Regs, HIV/HTLV-III, LAV Antibody Testing, Sept. 3, 1986 [city regulation].) Thus, even if a court were to order a test, no laboratory authorized and equipped to perform it would be able to do so without violating the law.[8]
The State and city have demonstrated a similar concern for the confidentiality of records of persons already tested and found to be infected with AIDS. Such records are specifically subject to the confidentiality requirements of Public Health Law § 206 (1) (j) and 10 NYCRR 24-1.2 (eff Dec. 23, 1985) (see also, NY City Health Code § 11.07 [a], [b] [as amended Sept. 27, 1983).[9] The Department of Health has proposed a bill to *217 create a new article 27-H of the Public Health Law. (NY City draft of proposed AIDS Confidentiality Bill [circulated by NY City Dept of Health, Jan. 11, 1988, as 88 Health No. 1).
This proposed legislation would further strengthen and clarify legal protections for confidentiality of AIDS records. One of its provisions, reflecting the current policy of health officials, would prohibit turning over such confidential information, even pursuant to court order, absent a showing of "compelling need for disclosure which cannot otherwise be accommodated in a civil or criminal proceeding.” (Public Health Law proposed § 2797 [2] [h] [i] [emphasis added].) This, it should be noted, deals with compulsory protection of records only after a person has voluntarily been tested. The testing itself is, of course, a far greater intrusion.
Existing regulations and laws, as well as the stated policy of responsible health departments and health officials, demonstrate a public policy militating strongly against court interference in the confidentiality of existing records, and unalterably opposed to judicially coerced nonvoluntary testing.
PHYSICAL EXAMINATIONS AND TESTS PURSUANT TO CPLR 3121
CPLR 3121 (a) provides as follows: "After commencement of an action in which the mental or physical condition or the blood relationship of a party * * * is in controversy, any party may serve notice on another party to submit to a physical, mental or blood examination by a designated physician”. The party seeking such examination must meet two burdens. First, s/he must demonstrate that the other party’s mental or physical condition is actually "in controversy”. (See, e.g., Koump v Smith, 25 NY2d 287 [1969].)
Second, the party seeking the test or examination must ordinarily demonstrate that the evidence sought is "material and necessary” pursuant to CPLR 3101 (a), referable to disclosure under CPLR 3121 (a) (see, Koump v Smith, supra). If these burdens are met, the party opposing the test may assert that the material or examination is privileged under CPLR *218 3101 (b) and 4504. As to this issue, the opposing party has the burden.
The requirement that the movant show the requested test or physical examination to be only material and relevant is not, however, universally applied. Section 3121 is generally employed in personal injury actions where a plaintiff who seeks monetary recovery can be deemed to have waived privacy and confidentiality claims about relevant physical information by virtue of commencing her/his lawsuit. Virtually all of the case law under the section has arisen in this context.
More recently, however, physical tests have been sought from defendants, posing an entirely different conceptual situation because of their involuntary participation in the action.[10] Professor Siegel suggests that this may require a "stronger showing” than is necessary in the usual case. This suggestion has already been implicitly adopted in the family law setting.
Thus, where the physical condition of the defendant is in controversy and the evidence sought is arguably material and relevant but where there are other, less intrusive ways of proving the facts in controversy, a blood test will not be ordered. (See, Matter of Ivette D., 118 Misc 2d 434 [Fam Ct, Kings County 1983].)* [11] Courts have also refused to order tests, *219 even though material and relevant where the result of such tests would unnecessarily stigmatize the parties. (See, Hill v Hill, 20 AD2d 923 [2d Dept 1964]; Matter of Ivette D., supra.)
There is, therefore, authority for flexible application of CPLR 3121 depending on the context in which the test is sought and the nature of the test itself. Based on the special characteristics and dangers of AIDS testing and on the strong public policy of confidentiality and insistence in voluntary testing, I hold that the most stringent test — that is, a showing of compelling need — must be met before an involuntary test for the HIV antibody may be ordered.
EFFECT OF RESPONDENT HAVING AIDS
It is important to note what is not at issue here. There is no claim, nor could there be on the available medical evidence, that the children would be in danger from living with respondent if he were seropositive.
The overwhelming weight and consensus of medical opinion is clear; the HIV virus is not spread casually. Rather, it has specific and well-known modes of transmission, through sexual contact, exposure to infected blood or blood components, and prenatally from mother to infant. (Recommendations for Prevention of HIV Transmissions in Health Care Settings, 36 Morbidity and Mortality Weekly Report 35 [Aug. 1987].) A recent summary of HIV infection routes concludes that the three, routes discussed above "still remain the only ones demonstrated to be important”. (Freeland and Kline, Transmission of the Human Immuno Deficiency Virus, 317 New Eng J Med 1125 [Oct. 1987].)
Numerous studies have found no risk of HIV infection through cióse personal contact or sharing of household functions. (See, Curran et al., Epidemiology of HIV Infection and AIDS in United States, 239 Sci 610, 615, n 45 [Feb 5, 1988]; e.g., Lawrence, HTLV-III/LAV Antibody Status of Spouses and Household Contact Assisting in Home Infusion of Hemophilia Patients, 66 Blood 703, 704-705 [1985].) These studies have figured prominently in decisions by Federal and State courts upholding the rights of HIV-infected children to attend public schools (see, e.g., Ray v School Dist. of Desoto County, 666 F Supp 1524, 1530-1532 [MD, Fla 1987]; Thomas v Atascadero Unified School Dist., 662 F Supp 376, 380 [CD, Cal *220 1987]; District 27 Community School Bd. v Board of Educ., 130 Misc 2d 398 [Sup Ct, Queens County 1986]; cf, Jane W. v John W., 137 Misc 2d 24 [Sup Ct, Kings County 1987] [father suffering from AIDS not precluded from visitation with 1½-year-old daughter]).
Instead, petitioners make two other claims. They are: (1) "that a person with AIDS, among other reasons, has a minimal life expectancy, which is certainly a consideration in the courts awarding temporary or permanent custody”; and (2) "the court will want to consider if a person facing a death-threatening illness is prone to take his own life and that of others.”
It is well settled that the fact of a handicapping condition alone cannot deny custody to an otherwise qualified parent (e.g., Matter of Hatz v Hatz, 116 Misc 2d 490 [Fam Ct, Rensselaer County 1982], citing leading case of Carney v Carney, 24 Cal 3d 725, 598 P2d 36 [1979]). The question which must be answered is the effect, if any, of the handicapping condition on the child or children.
The expert psychiatrist appointed by the cqurt interviewed all parties and the children. His testimony was clear that even if the respondent were suffering from AIDS and had a shortened life span, this fact would not justify removing the children from their long-term custodial parent with whom they have such strong bonds of love and affection. In addition, again assuming that the respondent actually suffered from AIDS, the expert witness felt that respondent’s knowledge of the disease would create no danger to him or to the children. Finally, the expert testified that he saw no evidence of any suicidal ideation.
The psychiatrist was asked to assume the worst case scenario precisely to determine whether a test or examination would produce evidence necessary or relevant to this proceeding. Since it is the expert’s opinion that infection with AIDS would not justify removal of these children from their loving long-term custodial parent, the need for such information, if it must be involuntarily compelled, cannot be justified.
CONCLUSIONS
AIDS is a terrible and tragic reality in our city, State, Nation, and world. Although many approach AIDS victims with sympathy and compassion, AIDS has all too frequently been the occasion for discrimination, stigmatization, and hys *221 teria. As an institution which is and should be a bulwark against discrimination of all kinds, the court system must be especially wary about attacks on individual and social rights made in the guise of health-related AIDS claims.
I have no reason to believe, and do not mean to suggest that the petitioners in this case acted in other than good faith in bringing on this application. Nevertheless, the potential for misuse in other cases cannot be overlooked, particularly when coupled with possible racism or homophobia, given the composition of the major groups "at risk” for AIDS. Accordingly, the requirement of showing a compelling need for involuntary testing in civil litigation must be recognized and enforced by the courts in this painful and troubled time.
For the reasons discussed above and on the facts of this case, I find that no compelling interest has been shown. Even if the more lenient test of relevancy and materiality were applied, however, petitioners have not met their burden here.[12] Accordingly, the motion, insofar as it seeks an involuntary blood test for the HIV antibody is denied.[13]

. The ELISA test is highly sensitive to HIV antibodies, so much so that its potential for error is to "overreact” resulting in a false-positive. The New York Blood Center has found that 1 to 3% of donors are repeatedly positive on the ELISA test and that 90% of those are negative on the confirmatory test. A study conducted by the Atlanta Red Cross and the CDC in 1985 tested 61,190 units of blood, finding 569 to be initially reactive on an ELISA test but 171 repeatedly ELISA reactive. Of the 150 which were tested further, only 40 were confirmed as positive. (Ward et al., Laboratory and Epidemiologic Evaluation of Enzyme Immuno Assay for Antibodies to HTLV-III, 256 J Am Med Assn 357 [1986].)

. The Western Blot became the first confirmatory test to be licensed by the Food and Drug Administration shortly after the CDC conference on testing. (Biotec Research, DuPont AIDS Cleared by the FDA, Wall St J, May 1, 1987, at 5.)

. See, e.g., Mar link et al., Low Sensitivity of ELISA Testing in Early HIV Infection, 315 New Eng J Med 1549 (1986).

. The predictive value for seropositivity of an ELISA positive confirmed by a Western Blot has been estimated at 90.9% in a population in which the level of infection is .05%. For every 100 people who test positive in that group, 10 will be false-positives. (Davis, Serologic Tests for the Presence of Antibody to Human T-Lymphothropic Virus Type III, at 17, table III [1986].)

. See, Burke et al., 256 J Am Med Assn 347 (1986).

. See, e.g., Pindyck, Psycho-Social Impact of Anti-HTLV-III Notification: The New York Experience, in N.I.H., Impact of Routine HTLV-III Antibody Testing of Blood and Plasma Donors on Public Health (1986).

. But see, Local 1812, Am. Fedn. of Govt. Employees v United States Dept, of State (662 F Supp 50 [Dist Ct, DC 1987]), holding that no preliminary injunction would issue against inclusion in medical fitness program for foreign service employees of a blood test for the HIV antibody. The court found that the test there involved no additional intrusion (since a full blood work-up was already required) and was rationally and closely related to fitness for duty in a post with inadequate ability to deal with AIDS. Significantly, the Department of State had determined that "HIV-infected individuals showing no symptoms of related disease and without significant immune system dysfunction * * * are eligible for placement in the United States and * * * posts in * * * foreign countries which do not present unusual health hazards and where adequate medical care is believed to be available. Individuals in more serious condition are limited to United States service. No employee will be separated * * * by a finding of HIV infection.” (Supra, at 52.)

. Several requests for HIV-antibody tests have been made by the District Attorneys Offices in New York City (e.g., People v Santana, indictment No. 4419/83, Sup Ct, Queens County). In such cases Dr. Stephen C. Joseph, the Commissioner of the Department of Health of the City of New York, has submitted an affidavit setting forth this policy and set of regulations, and the requests have been withdrawn.

. In his affidavit in People v Santana (indictment No. 4419/83, Sup Ct, *217 Queens County), Dr. Joseph explicitly made the connection between involuntary testing and confidentiality. He wrote: "Testing in the absence of consent may also have harmful consequences for the AIDS antibody testing program. A precedent established by coercive, non-anonymous testing could undermine the City’s efforts to assure individuals of its commitment to confidentiality.”

. As Professor Siegel writes in the 1987 Supplementary Practice Commentaries to CPLR 3121: "[T]here is always more conceptual trouble in exacting a'physical examination of a defendant than of a plaintiff, mainly because of physician-patient privilege. Waiver of the privilege is not hard to spell out with a plaintiff whose examination is sought. The invocation of the court’s jurisdiction is a strong basis for a waiver. But the defendant, who just wants to be left alone, is no jurisdiction invoker. The waiver route is not available, therefore, or harder to negotiate in any event, when the one whose condition is involved is the defendant.” (McKinney’s Cons Laws of NY, Book 7B, CPLR C3121:6, 1988 Pocket Part, at 294.)

. That case involved a child protective proceeding where the respondent/stepfather was charged with having sexually abused his 13-year-old stepdaughter by engaging in repeated acts of sexual intercourse over a period in excess of one year. It was further alleged that as a result of this sexual abuse the child gave birth to an infant son. The Commissioner of Social Services moved for a human leukocyte antigen (HLA) blood-grouping test of the stepfather, the child and her infant in an effort to prove the alleged sexual abuse. The court denied the request and wrote as follows: "The HLA test, in the instant proceeding, is neither material nor necessary to the prosecution of the action. It is unnecessary, certainly, in that the subject child is a willing, competent, and available witness to testify at the trial. It is immaterial, in the sense that the establishment of probable paternity, is not required to prove what is at issue in the proceeding — that is, sexual abuse of the child and, further that an exclusion of paternity could not free the respondent from meeting the issue of alleged repeated *219 sexual intercourse with the child.” (Matter of Ivette D., 118 Misc 2d 434, 438.)

. The issue of potentially shortened life span is also insufficient grounds for removing custody (ef, Collins v Collins, 115 AD2d 979 [4th Dept 1985]).

. As respondent has offered and agreed to undergo a physical examination, arrangements for this will be made by the court in consultation with attorneys for both sides. In the unlikely event that respondent actually does suffer from AIDS, this information will be necessary for him in terms of planning his own long-term care as well as considering long-term arrangements for the children. The physical examination is both voluntary and nonintrusive, and, to the extent that it .would turn up evidence of AIDS itself, rather than simply seropositivity, is far more useful given the issues and facts in this case.