IN RE INTEREST OF JOHN T., A CHILD UNDER 18 YEARS OF AGE. STATE OF NEBRASKA, DEPARTMENT OF SOCIAL SERVICES, APPELLEE, V. PATRICK T. CARRAHER, GUARDIAN AD LITEM, APPELLANT, AND G.B. AND J.B., APPELLEES.

538 N.W.2d 761

Filed October 3, 1995. No. A–95–215.

Patrick T. Carraher, guardian ad litem.

Don Stenberg, Attorney General, Cecile A. Brady, and, on brief, Royce N. Harper for appellee State.

SIEVERS, Chief Judge, and IRWIN and MUES, Judges.

SIEVERS, Chief Judge.

In this case, we examine the Department of Social Services (DSS) plan to remove a $3^1/_2$-year-old child from his foster parents, with whom he has lived since he was 3 months of age, and place him in the home of other foster parents. The proposed change is a result of the fact that the child's present foster mother is afflicted with acquired immunodeficiency syndrome (AIDS). The separate juvenile court of Lancaster County approved the DSS plan to move the child, and the child's guardian ad litem now appeals to this court.

## PROCEDURAL BACKGROUND

The separate juvenile court of Lancaster County adjudicated John T. as a child without proper support through no fault of his parents under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1993) on April 9, 1992. The natural mother and father of John voluntarily relinquished to DSS their parental rights pursuant to Neb. Rev. Stat. § 43-106.01 (Reissue 1993), and as a result the juvenile court found that John was a child as defined in § 43-247(8), to wit: "Any juvenile who has been voluntarily relinquished, pursuant to section 43-106.01, to the Department of Social Services . . . ." On March 27, 1992, at the age of 3 months, John was placed in the custody of the foster parents involved in this litigation, J.B. and G.B., who are husband and wife. On May 27, 1994, DSS filed a "Notice of Placement Change," stating that it intended to change foster placement of John from the foster home of J.B. and G.B. to the foster home of another couple. The guardian ad litem and the current foster

parents opposed the placement change.

After extensive evidentiary hearings, the court issued its order approving the DSS plan. The guardian ad litem filed a motion for new trial, which was overruled, and a timely appeal to this court was filed on February 14, 1995. On June 8, the guardian ad litem filed a request that this court order a stay of the juvenile court's order. Although that request was denied, we ordered the appeal expedited, advised counsel that no extension of brief dates would be granted, and set the case for oral argument during the court's September 1995 session.

## JUVENILE COURT DECISION

The juvenile court found that it was in John's best interests that he remain in the custody of DSS and that its "permanency plan" that he be adopted was also in his best interests. The court recited that DSS has located people who can provide "long term permanent placement" via adoption, which DSS can approve, and that the evidence "does not establish, by clear and convincing evidence, that the best interests of the child require that an alternative disposition to the Department's plan be made." Thus, the court approved the plan to "transition" John to the new foster/adoptive home.

In its order overruling the motion for new trial, the court made somewhat different findings, but with the same result. The court found that the proposed plan involved a change of placement so fundamental to the care, custody, and placement of the child that it could only be described as dispositional in nature and that the objection of the guardian ad litem to the plan constitutes an alternative disposition for the child. Therefore, proof by a standard of "clear and convincing evidence" was required to approve such alternative disposition. The court then found that the evidence did not establish by clear and convincing evidence that the DSS plan was not in the best interests of the child. Moreover, the court found that even if the guardian ad litem's objection were not considered an alternative disposition, there was a failure to prove by a preponderance of the evidence that the DSS plan was not in the best interests of the child. The court reasoned that approval of the plan would hold, irrespective of whether the evidentiary standard was that

found in Neb. Rev. Stat. § 43-284.01 (Reissue 1993) (clear and convincing evidence) or the lesser standard of Neb. Rev. Stat. § 43-285 (Reissue 1993) (preponderance of the evidence). A specific finding was made that the plan of DSS was in the best interests of John, and the motion for new trial was overruled.

## ASSIGNMENTS OF ERROR

The guardian ad litem assigns the following six errors of the trial court: (1) in presuming that the plan of DSS was in the best interests of John, (2) in imposing a burden of proof of clear and convincing evidence upon the guardian ad litem rather than by a preponderance of the evidence, (3) in finding that "it was restricted by the authority of the Nebraska Department of Social Services," (4) in approving the plan of DSS "when the majority of the evidence favored the position of the guardian ad litem," (5) in changing John's placement because of the health status of one of his caregivers, and (6) in failing to find that the " 'health' regulation of the Department of Social Services was in violation of the Equal Protection Clause of the 14th Amendment to the U.S. Constitution."

## STANDARD OF REVIEW

As this is the appeal of a final order from a juvenile court, our standard of review is that we try factual questions de novo on the record. We are required to reach a conclusion independent of the findings of the trial court, but when the evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another. *In re Interest of L.W.*, 241 Neb. 84, 486 N.W.2d 486 (1992). With respect to legal questions, the appellate court reaches independent conclusions of law. *State v. Yelli*, 247 Neb. 785, 530 N.W.2d 250 (1995).

As part of articulating our standard of review, we must address the matter of the burden of proof in the trial court, about which there is much disagreement and argument in the briefs. The juvenile court's order perhaps reflects some confusion about the burden of proof. The guardian ad litem asserts that his burden of proof is to show by a "preponderance of the evidence" under § 43-285(2) that the DSS plan to

"transition" John from his present foster parents and place him with other foster parents is not in the best interests of the child. On the other hand, DSS claims that the guardian ad litem's burden of proof is to show that the plan is not in the best interests of John by "clear and convincing evidence" under § 43-284.01. The juvenile court, in its final order, appears to have adopted the "clear and convincing" standard for the burden of proof, but approved the plan irrespective of whether the guardian's burden of proof was by a "preponderance of the evidence" or by "clear and convincing evidence." The juvenile court found that the guardian ad litem would not prevail under either standard.

The Nebraska Supreme Court faced a somewhat similar situation in *State v. Souza–Spittler*, 204 Neb. 503, 283 N.W.2d 48 (1979). In *Souza–Spittler*, the appellant claimed that the trial court had erred in failing to specifically find that the State's burden of proof when terminating parental rights was by clear and convincing evidence rather than a preponderance of the evidence. The Supreme Court held that termination of parental rights should in fact be based on clear and convincing evidence, but no reversal of the juvenile court was required, since the evidence before the juvenile court satisfied even the stricter "clear and convincing" standard. In support of its decision, the Supreme Court noted that in any event, the matter was triable de novo in the Supreme Court and that since a correct judgment or order was made by the lower court, the fact that it contained erroneous declarations of law did not require reversal, citing *Lux v. Mental Health Board of Polk County*, 202 Neb. 106, 274 N.W.2d 141 (1979).

Here, too, we try this matter de novo on the record. Which burden of proof the juvenile court used is not a decisive matter on appeal. For our part, we rely upon the Supreme Court's recent pronouncements in *In re Interest of Constance G.*, 247 Neb. 629, 636–37, 529 N.W.2d 534, 540 (1995):

> We have held that a juvenile court has the discretionary power to prescribe a reasonable plan for parental rehabilitation to correct the conditions underlying the adjudication that a child is a juvenile within the Nebraska Juvenile Code. *In re Interest of L.O. and B.O.*, 229 Neb.

889, 429 N.W.2d 388 (1988); *In re Interest of L.H.*, 227 Neb. 857, 420 N.W.2d 318 (1988). While § 43-285 grants the juvenile court discretionary power over a plan proposed by the department, it also grants a preference in favor of such a plan. In order for the court to disapprove the department's plan, a party must prove by a *preponderance of the evidence* that the department's plan is not in the child's best interests.

(Emphasis supplied.)

■ The statute referenced in *In re Interest of Constance G.*, § 43-285, provides at subsection (2) for DSS plans to be filed with the juvenile court for the "care, placement, and services" to be provided for a child adjudicated under § 43-247(3), as is true of John. Section 43-285(2) then provides: "If any other party, including, but not limited to, the guardian ad litem, parents, county attorney, or custodian, proves by a preponderance of the evidence that the department's plan is not in the juvenile's best interests, the court shall disapprove the department's plan."

Accordingly, the standard which we use in the trial de novo on the record conducted by this court is that the guardian ad litem must prove by a preponderance of the evidence that the DSS plan to "transition" John from his present foster parents to a new set of foster parents is not in the best interests of John. Our conclusion in this regard dispenses with the need for further discussion of the guardian ad litem's first three assignments of error concerning the burden of proof in the juvenile court. Thus, we turn to the guardian ad litem's fundamental proposition that the preponderance of the evidence establishes that it is in John's best interests to remain with J.B. and G.B.

## FACTUAL BACKGROUND

John was born December 28, 1991. He was placed with J.B. and G.B. at the age of 3 months, and he has resided with them from that time forward. John's biological mother has suffered from schizophrenia over half of her life, and his biological father was incarcerated on a sexual assault charge. Additionally, there is some evidence of mental illness of the biological father,

but the record does not contain a clear diagnosis, although there are several references to his also being afflicted with schizophrenia. Both biological parents surrendered custody of the child and ultimately relinquished their parental rights to DSS. The placement of John with J.B. and G.B. was considered a "fos-adopt" placement, a term of art meaning that placement was assumed to be permanent with an adoption to occur when the child became available for adoption. J.B. and G.B. have had more than 10 foster children placed with them by DSS since their application to be foster parents in December 1990. G.B. stays at home caring for John and operates an in-home day-care center with several other small children. J.B. is steadily employed earning a middle-class income. The foster parents own their own home, and all DSS home studies have been satisfactory. The evidence establishes that the foster parents have been good and appropriate parents, that John is developing and progressing normally, and that the DSS plan for a change in placement flows directly from the mother's state of health.

. The foster parents were married in 1989. G.B. tested positive for the human immunodeficiency virus (HIV) in 1989 and began taking the drug AZT, the generally accepted method of treatment. At the time the foster parents applied to be "fos-adopt" parents, they knew that G.B. was HIV positive and was on AZT. Neither G.B. nor her husband disclosed these facts to DSS.

The evidence shows that the Centers for Disease Control and Prevention have a number of diagnostic hallmarks for when an HIV infection becomes AIDS. When the patient's CD4+ T-lymphocyte count (an indication of immune system status) is below 200, which was true of G.B. on June 1, 1994, the diagnosis becomes AIDS rather than merely HIV positive. The foster father has tested negative for HIV as recently as August 1994. There are four generally acknowledged modes of transmission of HIV: (1) blood or blood products, (2) sexual activity involving the exchange of bodily fluids, (3) shared needles, and (4) transmission from mother to child during pregnancy or childbirth. Dr. Richard Morin, a specialist in infectious diseases who treats HIV and AIDS patients, testified that transmission to household members who are not sexual

partners is a risk which is "miniscule, at best." Dr. Morin further testified that HIV survives poorly outside the body and that transmission in the household through dishes, dirty Kleenex, toothbrushes, et cetera, does not occur. The greatest risk of transmission is through sexual activities, and thus, the majority of his recommendations to avoid transmission of HIV concern that subject. The foster parents testified that they are sexually active with each other, but practice "safe sex."

Dr. Morin testified that the life expectancy of a person with AIDS is difficult to predict, as some people get the infection and die relatively quickly and others survive longer periods of time. Statistically, Dr. Morin recounted that the overall fatality rate for AIDS cases diagnosed in the State of Nebraska since 1983 is 56 percent. Dr. Morin characterized the claim that everyone with AIDS will ultimately die of it as speculation, and when asked if G.B. has a 100-percent probability of dying of AIDS, he described that as "speculative, at best." However, Dr. John Donaldson, a psychiatrist, testified that there is now an almost certain probability that G.B. will die from AIDS and that it is a 100-percent fatal condition, and it was his opinion that G.B. "will become ill and eventually die while [John] is still a relatively young child."

Once G.B.'s diagnosis became known to DSS, the department approached the foster parents about changing from a "fos–adopt" program for John to a long–term foster care agreement, without adoption, to be reviewed by the court and DSS every 6 months. This plan is evidenced by a "court report" authored by the case supervisor, Patricia Squires, and dated March 2, 1994. Included in that report is a report of information from G.B.'s personal physician dated August 20, 1993, opining that she will develop AIDS within the next 7 years by a probability of 100 percent and that her probability of survival is " 'presently zero.' "

As recited in the procedural background, by late May 1994, DSS requested that the court approve a change in placement of John. Squires testified that the foster parents were uncooperative with regard to implementation of a long–term foster care plan. This failure to "cooperate" was evidenced solely by their insistence upon adopting John. When asked whether the foster

parents could not adopt John only because G.B. is HIV positive, Squires responded: "No, because we're not just considering her HIV positive. We're — At the foremost of our mind is how John, without medical advancement, losing his adoptive mother at a very young age, how that will impact his schizophrenia that is in his biological makeup." Although Squires described the decision concerning John's placement as a collaborative decision among herself, the director of DSS, medical and legal advisors, and others, only one witness, Dr. Donaldson, testified in support of the DSS position.

Dr. Donaldson is a board–certified psychiatrist, and children make up a substantial portion of his practice. He has done a "paper review" of this situation, but has never met the foster parents or John, nor has he seen them interact. Dr. Donaldson has rendered two opinions in this case. His initial recommendation to DSS was that John stay with the foster parents until the mother became increasingly ill and at that time, that John be moved to alternative care. Dr. Donaldson's second opinion, which was rendered at trial, is that John should be transferred to the care of others when he is age 3 or 4, while he is still a preschooler and before he is a concrete thinker and learns names. Dr. Donaldson opines that such a transition can be done in a positive fashion without great difficulty. The basis for the shift in Dr. Donaldson's opinion apparently stems from the opportunity to more fully review complete medical records of G.B. As a result, he concludes that she is becoming increasingly ill and is not asymptomatic, as she contends. In support of that position, he recites over 100 physician calls or visits from G.B.'s medical records, most of which related to problems typically seen in people with advancing HIV infections. From her medical records, Dr. Donaldson details a series of physical symptoms which he characterizes as symptomatic of advancing HIV infection, including, but not limited to, peripheral neuropathy pain, nosebleeds, low platelet count, thrombocytopenic purpura, splenectomy, sores on her head and hair loss, postoperative wound infections, multiple candidal infections, multiple fungal vaginal infections, fevers of unknown origin, allergic responses to antibiotics, and anxiety and depression.

The basis for Dr. Donaldson's opinion is that the seriousness of the foster mother's illness means a high risk that the child's "permanency" will be disrupted at a time when it is increasingly important, i.e., when the child begins school. He describes the situation as that of an increasingly ill person who becomes emotionally needy as a result of illness and thereby affects the support available for the child from the ill mother and the healthy father. Donaldson contends that the loss of a mother and father by a custodial shift is less traumatic at age 2 or 3 than it would be at a later time such as at age 6 or 8.

Dr. Donaldson also spoke to the matter of the child's biological family history. Since John's biological mother has been diagnosed with schizophrenia, there is a 14–percent chance that John will develop that illness. Should John's biological father have schizophrenia (which cannot be considered as established by the record), the probability increases to 50 percent that the child will develop schizophrenia.

Dr. Donaldson admits that the child has bonded with the foster parents, but asserts he is capable of bonding with others and that with a good transition to the care of another person or persons, such change would be to his long–term advantage. Dr. Donaldson does not assert that the foster mother's death would cause John to become schizophrenic, although he notes that it could cause him to become that way earlier rather than later. Nonetheless, Dr. Donaldson's testimony is that the foster mother's death would not affect the "ultimate outcome" as to whether John has schizophrenia. Dr. Donaldson characterizes the child's best interests as being in an adoptive situation where both parents can reasonably be expected to be alive during childhood, be well, and be emotionally available to him. Dr. Donaldson emphasizes the importance of emotional availability of the parents for the child, particularly one who is at risk for mental illness, as is John, so that the parents can identify problems the child might have and intervene on their own or seek outside help.

At the request of the guardian ad litem, a psychiatric evaluation of the child was sought and obtained from Dr. Ann Evelyn. This evaluation involved multiple clinical interviews,

including the child and both foster parents, the father alone, the mother alone, the father and mother as a couple, the mother and child, and the father and child, as well as a play session with the child. Dr. Evelyn gave an abbreviated mental status examination to each parent. Dr. Evelyn also reviewed extensive records concerning the foster parents, the biological parents, and the DSS file. Dr. Evelyn's recommendation was that John remain with the foster parents in permanent foster care or as an adoptive child. The basis of her recommendation is that John does not have the emotional development to hold an image of his mother as a protective, nurturing, and available person in his mind for a long time when she is absent. Because of his young age, the distress which he experiences when his mother is gone creates tension and anxiety which he cannot master. If he is removed from his foster mother at this age, his personality is likely to be damaged, even if his new caregivers are attentive and adequate. The consequences of such damage include running away in adolescence, behavioral fixation at the level of aggression, tantrums, restlessness, and a tendency to manipulate others or to become involved in power struggles with authorities.

Addressing the foster mother's health situation, Dr. Evelyn states that the foster mother's possible death is in the nature of an "ordinary" loss or grief process rather than one destructive to personality development. Dr. Evelyn concludes her opinion by stating that John has lived with the foster parents for over 85 percent of his life and that "[e]verything which helps him attain a sense of security, relationships to others, and motivation to grow and develop is connected to his place in their home."

Dr. George Williams, a clinical child psychologist, testified on the basis of his training and experience, as well as from his review of the reports of Drs. Evelyn and Donaldson. Dr. Williams agrees with Dr. Evelyn's conclusion that John needs to continue his relationship with the foster parents. Although not necessarily opposed to long-term foster care, Dr. Williams states that long-term foster care, as opposed to adoption, avoids the finalization of the family's commitment to each other. This opinion is consistent with DSS policy that a child of John's age who is free for adoption should be adopted rather than placed

in long–term foster care. When asked about moving John to a new family and having them adopt, Dr. Williams described that as being "a crime" because

> I just can't find one shred of clinical experience that I've had in sixteen years and [from] what I've read in the literature that would suggest that that's going to be a positive thing for this child or for any child, given the adaptive relationship that exists in this family system right now.

In Dr. Williams' opinion, it would be in the best interests of the child to stay with his present family. Dr. Williams criticized Dr. Donaldson's original recommendation to leave John with the foster parents and "transition" him when the mother becomes ill on the basis that the termination of a productive parent–child relationship at any time is not healthy at any developmental age. Dr. Williams opines that it would be harder to endure a change of placement than it would be to endure the death of a family member after many years of a functional nurturing relationship because being removed from a mother and father cannot be explained to or understood by the child.

Dr. Robert Ewart, the foster mother's personal physician, offered the opinion that both foster parents are capable of caring for children in their home. Dr. Ewart acknowledged that the foster mother was diagnosed as HIV positive in February 1989, but stated that the medical progression of her condition has been gradual and that as of August 1993 she had no symptoms. However, Dr. Ewart said that her prognosis was poor and that there is zero probability that she will survive if she develops AIDS. Dr. Ewart stated that G.B.'s expected length of survival once AIDS develops is unknown, but that this conclusion assumes current medical care and does not include expected advances in medical care.

The record contains a report from April 1994 from the Nebraska Foster Care Review Board (Board), which recites the history of this matter and takes note of the opinions of Drs. Evelyn and Donaldson. Although the Board was critical of the fact that DSS appeared to have more than one plan in place for John, its recommendation was as follows:

> The Board recommends that John [T.] NOT be removed

from his current placement, and that the adoption process should proceed as originally planned. The Board is of the opinion that although the foster/adoptive mother does have a serious health problem, that no child ever has a guarantee that any parent will live till said child attains adulthood.

The Board strongly recommends that John be given permanency as soon as is practicable due to his young age. The Board supports adoption of John by the [foster parents] because even if [G.B.] should eventually die from her illness, John would still have his father, and a **real extended family** which would be available to provide the necessary emotional support which he would need. If John is left to languish in long term foster care, then John would have no "real" family which he could call his own, in the possible event of the death of his adoptive mother.

(Emphasis in original.)

The foster mother testified that she considers her condition stable and that she takes the medication AZT. She did not disclose her HIV positive status to DSS because she felt DSS would not have placed a child with them. She runs a day care that has two children on a full-time basis and one child on a part-time basis. G.B. testified that it is in John's best interests to be adopted by her and her husband because

we're his mom and dad. . . . [W]e would never give up on him. I mean, if he gets schizophrenia, that's okay. I mean, we're the parents. We will be there as long as — you know, one of us will be. I may not be. I know [J.B.] will be, I know our families will be. They're aware of it, you know. I'm going to try to be there for him as long as I can . . . .

G.B. described a close relationship with her parents, whom she sees two or three times per week, and that relationship includes John. G.B. testified that her husband works an evening shift and therefore is present in the morning and early afternoons to help with John and play with him. She testified that she feels her husband has been ignored throughout this process and that he plays with John and teaches him. She describes John and her husband as inseparable.

Selected regulations from the Nebraska Administrative Code concerning DSS were received into evidence, including 474 Neb. Admin. Code, ch. 4, § 020.04 (1988), which provides that adoption must be "the plan for any child free for adoption." The evidence is undisputed that John is a child "free for adoption." 474 Neb. Admin. Code, ch. 4, § 020.17B (1990), provides that "[w]hen the child has been living with a foster family who wishes to adopt, their request must be considered."

## BEST INTERESTS ANALYSIS

When G.B.'s HIV positive status was discovered by DSS, a change in plan took place. In March 1994, the case supervisor, Squires, reported to the juvenile court and put forth a new plan for John which was long–term foster care placement with the current foster parents, but without adoption. However, by late May of that year, it appears that the director of DSS, as well as others involved with this situation, realized that such a plan was inconsistent with DSS' own rules and regulations. Section 020.04 requires that a child free for adoption, as John is, have adoption as the plan, not foster placement. This is the apparent genesis of the present plan of DSS to remove John from the care of J.B. and G.B. and "transition" him to the care of new foster parents for adoption, as DSS will not consent to an adoption of John by his current foster parents, according to the testimony of Squires.

A complete and thorough review of the evidence in this case establishes that John has bonded with and is attached to his foster parents; that there are no deficiencies in the care John receives; that the three of them view each other as mother, father, and family; that John has extended family via J.B. and G.B. with whom he has also bonded; and that there is virtually no risk that HIV will be transmitted to John through ordinary household contact. Although there is considerable discussion in the evidence of the deception practiced by the foster parents in not disclosing the mother's HIV positive status, that deception is not the basis for the plan being proposed by DSS. The basis of that plan is the belief that the foster mother will die before John reaches the age of majority, and thus, it is in John's best interests to be removed from that obviously difficult and painful

situation and placed in a home where he can be adopted by parents who are not faced with the apparently inevitable death of the wife and mother within the near future. Also entering into the consideration of the DSS caseworkers and Dr. Donaldson, who supports the DSS plan, is the fact that John has a biological family history of schizophrenia. Although no witness asserted that the trauma of the death of a parent causes schizophrenia, Dr. Donaldson expressed the concern that such a trauma could accelerate the onset of schizophrenia, if he is going to be so afflicted.

This case requires the legal system to answer a most difficult question. The question, at its most basic level, is whether it is better for John to stay with his foster parents and see what some witnesses assert is the virtually certain suffering and death of his foster mother from AIDS or whether it is best for John that he be removed from the care and love of his foster mother and father so that he can be placed with a "healthy set" of foster parents where he does not face the near certainty of having to endure at a tender age the death of his mother.

The end result of this litigation is that John will have one of two very difficult life experiences. We cannot precisely know today the ultimate impact of what we decide upon John's future well–being. Moreover, from an analytical standpoint, this case is not like the "adoption" cases. There, the clearly established constitutional rights of a biological parent mandate a legal preference over a proposed adoptive parent without consideration of the best interests of the child, absent a finding of unfitness on the part of the biological parent. See *Stuhr v. Stuhr*, 240 Neb. 239, 481 N.W.2d 212 (1992) (holding fit biological or adoptive parent has superior right to custody of child over a nonbiological or nonadoptive parent because of constitutionally protected parent–child relationship). See, also, *Petition of Doe*, 159 Ill. 2d 347, 638 N.E.2d 181 (1994), *cert. denied* ____ U.S. ____, 115 S. Ct. 499, 130 L. Ed. 2d 408, and *cert. denied* ____ U.S. ____, 115 S. Ct. 499, 130 L. Ed. 2d 408 (restoring custody to natural father of child who had been with proposed adoptive parents for over 3 years). See, also, *In re Adoption of Kassandra B. & Nicholas B.*, 3 Neb. App. 180, 524 N.W.2d 821 (1994) (upholding natural father's

right to custody without best interests analysis where father had not been adjudged unfit); *In re Application of Schwartzkopf*, 149 Neb. 460, 31 N.W.2d 294 (1948) (stating the same, unless the parent has forfeited or relinquished his or her parental rights).

Accordingly, a "hard and fast" rule of law does not govern this case. Instead, we must determine John's best interests, a standard which by its very nature is somewhat subjective and which eludes precise definition. Consequently, of necessity we must rely heavily upon the expert witnesses who testified about the impact upon John of the DSS plan to remove John from his foster parents. In other words, our decision flows from the evidence and our assessment of the weight thereof, rather than from well-established legal principles which dictate a clear result.

We have already extensively summarized in the factual background portion of this opinion the testimony and opinions of the experts who have testified in this case, as well as the other evidence. In summary fashion, the record contains the opinion of a clinical child psychologist, Dr. Williams, that John should not be removed from his foster parents. Dr. Evelyn, a psychiatrist, stated that John should remain with his foster parents. Both Drs. Williams and Evelyn felt that removal constituted a likelihood of damage to John's personality which was greater than the risk involved in a so-called ordinary life event such as the natural death of a parent. Dr. Donaldson, also a psychiatrist, initially recommended that John stay with his foster parents on a long-term basis until G.B. becomes ill with AIDS and that at that point, the child should be "transitioned." A later opinion from Dr. Donaldson was that the transition from the present foster parents to another set of foster parents where adoption could result should occur at the present time. Dr. Donaldson believes it is possible to make such a transition without harming the child. Into this evidentiary mix we must factor the initial decision of DSS, upon the discovery of G.B.'s HIV positive status, that John remain with his foster parents in a long-term foster care placement, but without adoption, as well as the emphatic opinion of the Board that John stay with them. We also consider that Dr. Donaldson has never spoken to the foster parents or the child, nor has he seen them interact.

Finally, the absence of risk to John from the HIV virus by household contact must be considered.

The Foster Care Review Act, Neb. Rev. Stat. §§ 43–1301 to 43–1318 (Reissue 1993), provides for a number of things which cause us to accord the Board's opinion substantial weight. Section 43–1314 requires the juvenile court to give notice to the Board of all reviews pertaining to a child in foster care placement and gives the Board the right to participate in such reviews. Section 43–1308(2) gives the Board the right to request the court to hold a review hearing. Pursuant to § 43–1308(1)(b), the Board *shall* submit its findings and recommendations to the court having jurisdiction over a child in foster care. Importantly, § 43–285(6) provides that the only prerequisite for the admission in evidence of the Board's written findings and recommendations is that they have been provided to all other parties of record. The Foster Care Review Act and the Board would be empty vessels indeed if the Board's recommendations were not considered by the court. Thus, we do not take the Board's emphatic stand against the DSS plan to be a meaningless gesture.

In our trial of this case de novo upon the record, we do not see the matter as one involving a conflict of fact requiring deference to the trial court's determination because of its having observed the witnesses. The case is, rather, a matter of disputed expert opinion about the consequences of a proposed course of action given a set of essentially well–established and undisputed facts concerning the child and his foster parents. As we have earlier held herein, the burden of proof is whether the guardian ad litem has established by a preponderance of the evidence that the DSS plan is not in John's best interests. Our conclusion is that the guardian ad litem has carried the burden of proof to establish that the proposed plan to remove John from his foster parents is not in the best interests of the child. There is more credible evidence against the plan to remove John than there is in support of the plan.

This is not to say that we are unconcerned about the deception practiced by the foster parents in failing to reveal the foster mother's HIV positive status. Clearly, the written application process is such that disclosure of this information

would have occurred, had the foster parents been truthful. The department's regulation on health, 474 Neb. Admin. Code., ch. 4, § 010.04C (1988), would clearly cause G.B.'s condition to be closely examined, and perhaps rejection of the application to be "fos–adopt" parents would have occurred. We let the language of the regulation speak for itself:

> 4–010.04C Health: An applicant must be in such physical/mental condition that it is reasonable to expect him/her to be able to fulfill parenting responsibilities. In case of adoption, health should be maintained to the child's majority. The worker may request a physician's and/or therapist's report on the health of an applicant if there appears to be a health condition that might affect parenting ability. A negative report may be the basis for denial of an application at any point in the home study process.

However, the evidence is that DSS does not have a specific policy on AIDS, and other than may be inferred from the foregoing regulation, there is no evidence about what would have been done with the application if G.B.'s health status had been fully disclosed. The foster parents' rationale for the deception is that they would not have been approved as foster parents, and we suspect that is so. However, if the deception of the parents were now used to decide the outcome of this case, we would be putting aside the matter of John's best interests, which is our focus. Consideration of that deception clearly played a role in Dr. Donaldson's opinion, as he so testified. As far as John is concerned, there is no deception. The matter is rather simplistic when viewed from John's eyes: G.B. and J.B. are his parents, they love and care for him, and he is attached and bonded to them. We cannot say it is per se against the child's best interests that his parents have hidden a health condition which generates from some quarters a degree of discrimination, hysteria, and paranoia. See *Doe v. Borough of Barrington*, 729 F. Supp. 376 (D.N.J. 1990), for a collection of examples of such reactions in an opinion finding that a police officer violated the plaintiffs' 14th Amendment rights by disclosing that a member of their family had AIDS.

There is no evidence that the deception itself adversely

affects John, except to the obvious extent that absent the dishonesty, he likely would not be in a position where we must discern which alternative is "less bad" for John. Keeping John's best interests at the forefront of the analysis requires that we put aside what is essentially a punitive notion that John cannot stay with his foster parents because they were dishonest about G.B.'s health. If we do not do this, we run the risk that John is also punished for the foster parents' deception.

Although the "best interests of the child" test is most often addressed in the context of custody disputes between natural parents, the considerations used in those cases are not inappropriate here.

"In determining a child's best interests in custody matters, a court may consider factors such as general considerations of moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; parental capacity to provide physical care and satisfy educational needs of the child; . . . and the general health, welfare, and social behavior of the child."

*Ritter v. Ritter*, 234 Neb. 203, 211–12, 450 N.W.2d 204, 211 (1990).

Of these considerations, the record shows only that the capacity of the foster mother to care for the child is compromised by virtue of her illness, which is only true at an uncertain point in the future. She is presently fully capable of parenting John, as well as operating her business. Moreover, DSS regulation § 020.17B requires that when a child has been living with a foster family who wishes to adopt, their request must be considered, and the assessment shall include the "[e]xtent of firmly established psychological bonding." A bond of that nature is indisputably present in this situation.

We have searched the legal literature for guidance, but we have been unable to find a case in which an attempt was made to remove a foster child from his foster parents due to the HIV

or AIDS infection of one of such parents. However, there are decided cases involving parents, children, and this illness. For example, in *Newton v. Riley*, 899 S.W.2d 509 (Ky. App. 1995), the child's father sought modification of a joint custody arrangement to give him sole custody upon learning that the mother's new husband had AIDS. The appellate court found that the trial court did not err in refusing a change in custodial arrangements, holding that the dispositive factor in "public school case law" and "custody/visitation case law" has been the courts' reliance on the medical community's increased understanding of HIV and the modes of transmission. *Id.* at 510. The court stated that "[t]he widely accepted conclusion among medical researchers is that there exists '[n]o risk of HIV infection through close personal contact or sharing of household functions.' " *Id.*, citing *Steven L. v. Dawn J.*, 148 Misc. 2d 779, 561 N.Y.S.2d 322 (1990), quoting *Doe v. Roe*, 139 Misc. 2d 209, 526 N.Y.S.2d 718 (1988). See, also, *Stewart v. Stewart*, 521 N.E.2d 956 (Ind. App. 1988) (holding that trial court could not restrict noncustodial father's visitation with his 2–year–old daughter on the sole basis that the father had AIDS, relying upon evidence that communication of virus by household contact was not a recognized method of transmission). In *Jane W. v. John W.*, 137 Misc. 2d 24, 519 N.Y.S.2d 603 (1987), the court held that a father was not precluded from visiting with his 18–month–old daughter because he had been diagnosed with AIDS, as expert testimony showed that there was little possibility of transmission to the child.

In *Doe v. Roe, supra*, the maternal grandparents sought custody of two minor children from their custodial father and moved for an order compelling involuntary testing of the father for HIV. The New York court analyzed the matter of compelling an involuntary HIV test, expressing particular concern over the discrimination and stigmatization directed toward those who have been diagnosed as HIV positive. The court found it would not compel an involuntary HIV test, as in any event, the law was well settled that a handicapping condition cannot deny custody to an otherwise qualified parent. The court cited the testimony of the psychiatrist that even if the father were suffering from AIDS and had a shortened lifespan, this fact

would not justify removing the children from their long–term custodial parent with whom they have strong bonds of love and affection. In a footnote, the New York court observed that "[t]he issue of potentially shortened life span is also insufficient grounds for removing custody." *Id.* at 221 n.12, 526 N.Y.S.2d at 726 n.12. Cf. *Collins v. Collins*, 115 A.D.2d 979, 497 N.Y.S.2d 544 (1985) (age of father at 65 was irrelevant on child custody issue where he was in excellent health).

In *Steven L. v. Dawn J., supra*, the mere fact that the mother had tested positive for HIV was not, without more, a material change of circumstances warranting change of custody from the mother to the father. In contrast, see *H.J.B. v. P.W.*, 628 So. 2d 753 (Ala. Civ. App. 1993), where a change–of–custody order from the father to the mother was affirmed on appeal in view of the custodial father's admitted homosexuality, HIV positive status, and lack of credibility as a witness which included attempting to hide his health status from the court, as well as the mother's improvement as a parent since the divorce.

Admittedly, the foregoing cases deal with the custodial or visitation rights of natural parents, whereas the instant case involves whether it is in the best interests of a child to stay with his foster parents, one of whom has AIDS. The State's brief asserts that J.B. and G.B. are persons without the standing of custodial parents "because they are 'legal strangers' to John [T.] who through deceit gained custody of a 'stranger child.' " Brief for appellee at 15. However, the fact of the matter is that the foster parents are not strangers to John, but, rather, when DSS proposed the plan, in John's eyes, they were *his parents*. The test for custody determinations for natural, biological parents is the best interests of the child. See *DeVaux v. DeVaux*, 245 Neb. 611, 514 N.W.2d 640 (1994). Similarly, the best interests of John govern this case. Thus, because the determinative standard is the same, we are unable to give the lack of a biological connection between the foster parents and John any meaningful force when assessing the child's best interests. To the extent that the foregoing authority is helpful, it supports the conclusion that the foster mother's AIDS infection, as well as its probable consequences, does not compel a change of foster parents.

Life is indeed uncertain, and no child is guaranteed that he

or she will proceed through childhood or adolescence with his or her parents healthy or even alive. There is no doubt that parental illness and death are very hard on children. It is our task to put aside the fact that the foster mother has AIDS, an illness laden with emotion. Instead, we view the matter as we would a case involving any potentially terminal illness of a parent. At oral argument, counsel for DSS agreed that the nature of the illness is not determinative. We know that parents suffer and die from illness, and their children observe this and suffer with their parents. However, the children hopefully learn that although painful, death is a natural part of the cycle of life. When parents are ill, and even terminally so, children are not removed from their ill parent, and certainly not from a healthy parent who will survive the spouse's illness. Given the bond that exists between John and his foster parents, we do not believe it is the function of DSS or the courts to save John from one tragedy, the probable death of G.B., the only mother he has known, by visiting another tragedy on him, a DSS plan which includes not only the loss of his mother, but his father as well.

## CONCLUSION

Upon our de novo review, we conclude that the preponderance of the evidence establishes that it is in John's best interests to stay with his present foster parents. In fact, the evidence strongly points to this conclusion. However, our decision should not be read as approval of the deceit of the foster parents—to so read the decision would be to *misread* it. We have decided this case on the basis of John's best interests as the law requires. Should John suffer the loss of his foster mother at a young age, his foster father and his extended family will be there to help him endure that misfortune. In the meantime, the evidence shows that he will be loved and well cared for. We reverse the decision of the separate juvenile court of Lancaster County and remand the cause to that court with directions to disapprove the DSS plan to "transition" John to another set of foster parents.

REVERSED AND REMANDED WITH DIRECTIONS.